607 So.2d 733 (1992)
STATE of Louisiana
v.
Robert HENDERSON.
No. 91-KA-2748.
Court of Appeal of Louisiana, Fourth Circuit.
October 15, 1992.
Harry F. Connick, Dist. Atty., Lisa A. McLachlan, Asst. Dist. Atty., New Orleans, for appellee.
M. Craig Colwart, Orleans Indigent Defender Program, New Orleans, for appellant.
Before KLEES, BYRNES and WALTZER, JJ.
BYRNES, Judge.
The appellant, Robert Henderson, and his co-defendant, Sterling Nelson, were *734 charged by bill of indictment on March 7, 1991, with aggravated rape, a violation of LSA-R.S. 14:42. Mr. Henderson entered a plea of not guilty on March 12, 1991. Following a two day trial, on September 4 and 5, 1991, a twelve member jury found the appellant guilty of forcible rape. The appellant was sentenced on September 30, 1991 to serve twenty-five (25) years at hard labor in the custody of the Department of Corrections, the first ten (10) years of which to be served without benefit of parole. On October 1, 1991, the State filed a multiple bill, alleging that the defendant was a third felony offender, vacated the original sentence, and sentenced the defendant under the habitual offender law to serve twenty-six and two thirds (26 2/3) years at hard labor in the custody of the Department of Corrections, without benefit of parole for the first ten years.
STATEMENT OF THE FACTS
The victim, age fifteen, suffers from learning disabilities and had been placed in a special education class. Her mental age was tested at twelve-years-old. On May 3, 1990, the victim, her cousin, Remember Pierce, and their friend, Rochandra Morgan, were walking from Remember Pierce's cousin's house to the victim's house at approximately 7:00 p.m. As the girls were walking at the intersection of North Rocheblave and Music Streets, a group of boys on a porch began calling to them. Two boys came forward and grabbed the victim and began dragging her into an alleyway. Rochandra and Remember stayed in front and yelled to the boys to let go of the victim. The boys dragged the victim into the house, through the kitchen, and into the back bedroom. The defendant, Robert Henderson, nicknamed "Leango," and his co-defendant, Sterling Nelson, were standing on a porch during this time but then went inside the house. Remember and Rochandra stayed in front of the house and yelled for about ten minutes for the victim. The girls left after about ten minutes and ran to the victim's house which was approximately three blocks away and told the victim's mother that her daughter had been dragged into the house. The victim's mother, accompanied Rochandra and Remember to the residence where the victim was taken. She walked through the house and found her daughter lying on the floor in a back bedroom. The victim was grabbing for her clothes and was wearing only her top.
The victim testified that two boys dragged her into the rear bedroom and removed her clothing below her waist. The victim's testimony is somewhat confused, but she positively identified Robert Henderson and Sterling Nelson as two boys who came into the room and raped her. The victim admitted that she has trouble remembering things and said that the police used the word "rape" and that her cousin told her the name "Leango" and provided the description of the defendant's clothing.
Officer Wellington received a call of a rape in progress. When he entered the residence, he heard footsteps running out the rear door. He saw the defendant, dressed in a yellow shirt, jeans and black boots, jump the fence in the rear yard. The victim was lying on the bottom bunk in the rear bedroom hysterically crying, wearing clothing above the waist only. The victim positively identified both the defendant and Sterling Nelson as two boys who raped her.
Dr. Jason Garrison, a resident physician at the Charity Hospital Emergency Room, testified that he examined the victim following the assault. Dr. Garrison found a fresh tear in the victim's hymen, indicating a recent trauma. Officer William Giblin testified that he conducted some tests on the victim's clothing and on the sheet found under the victim. Seminal fluid was found on the sheet, but officer Giblin could not identify a blood type from this sample.
DISCUSSION
A. Errors Patent
A review of the record for errors patent reveals none.
B. Assignment of Error
The appellant argues that the trial court erred in allowing the victim's mother to give impermissible hearsay testimony regarding *735 what her daughter told her about the alleged offense.
LSA-C.E. Art. 801 provides:
* * * * * *
D. Statements which are not hearsay.
A statement is not hearsay if:
(1) Prior statement of witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is:
* * * * * *
(d) Consistent with the declarant's testimony and is one of initial complaint of sexually assaultive behavior.
Comment "(e)" under this subsection states:

....It is only the initial complaint by the victim, whether made to a family member, policeman, or other person, that is defined as nonhearsay under this provision. Subsequent complaints or reports about the same crime would not be admissible under it. This may change Louisiana law. [Emphasis added.]
"Initial" complaint literally means "first" or "original" complaint and it is proper for this court to limit this exception to its narrow literal meaning. State v. Moran, 584 So.2d 318 (La.App. 4th Cir. 1991).
Here the victim responded to questions about the incident to Detective Ronald Smith immediately following the incident. She also gave a statement to Dr. Jason Garrison when being examined in Charity Hospital the same day. Her discussion of the incident with her mother over 24 hours later could be described as a "tertiary" complaint at best. As there is no way to construe the victim's statement to her mother as one of "initial" complaint, we must find that it was error to allow the victim's mother to testify about what her daughter told her.
If this error is harmless error, then reversal of the conviction is not warranted. LSA-C.Cr.P. art. 921. However, it is not sufficient for this court to find merely that there was enough other evidence to support the verdict. A higher standard must be met. For us to conclude that the admission of the statement constituted harmless error we must be able to conclude, beyond a reasonable doubt, that the improperly admitted hearsay did not contribute to the verdict. Chapman v. State of Cal., 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) rehearing den. Chapman v. California, 386 U.S. 987, 87 S.Ct. 1283, 18 L.Ed.2d 241 (1967); State v. Anderson, 450 So.2d 684 (La.App. 4th Cir.1984) writ denied 452 So.2d 696 (La.1984).
"Factors to be considered by the reviewing court include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness or material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." State v. Willie, 559 So.2d 1321, 1322 (La.1990).
The defendant suggests that without the inadmissible portion of the testimony of the victim's mother that the testimony of the mildly retarded victim was insufficient to support the conviction. Rape is a crime committed in secret where the only witness is usually the victim. We are loath to set a precedent that would encourage the victimization of the mentally slow by declaring all such testimony worthless. We believe that the trier of fact will weigh the mental capacity of the witness in evaluating the testimony.
For example, in State v. Peters, 441 So.2d 403 (La.App. 4th Cir.1983) a rape conviction based almost exclusively upon the testimony of a retarded twenty-nine-year-old woman with a mental age of 6 or 7 was upheld. In this case the mental age of the victim was twice that. If the testimony of the victim's mother's is excluded from the instant case the evidence that would support a conviction is still overwhelming compared to the Peters case.
In the instant case the victim stated that: "They stuck their thing in me." In the *736 Peters case the less articulate victim could only manage the phrase "Put thing in me," but it was sufficient to convince the jury beyond a reasonable doubt.
The medical report revealed a contemporaneous tear of the victim's hymen, which, although not conclusive, was circumstantially consistent with a finding of rape. Police Officer William Giblin, an expert in the testing and analysis of blood groupings testified that the sheet on the bed where the victim was raped tested positive for seminal fluid and sperm. Although the sample was not large enough to permit blood group testing, what he did find was again circumstantially consistent with a verdict of rape. In the Peters case there was no genital laceration, no seminal fluid and no sperm, and as the victim was menstruating at the time, the medical evidence was inconclusive.
Officer Wellington Beaulieu chased a man wearing distinctive clothing (e.g. a "Q93" shirt) running from the house where the incident occurred. Shortly thereafter, Officer Beaulieu apprehended the defendant close by wearing the same distinctive clothing. Although he did not actually witness the rape his testimony was circumstantially consistent with such a finding.
Rochandra Morgan and Remember Pierce, both eyewitnesses who knew the defendant by his nickname "Leango" confirmed that the defendant who was wearing a "Q93" shirt was among the young men who went into the house where the victim had been dragged in against her will. Ms. Pierce also testified that after the rape occurred she entered the house with Ms. Morgan and the victim's mother where she witnessed the victim pulling on her clothes. She saw the defendant and two other boys fleeing the house. Although neither Ms. Morgan nor Ms. Pierce actually witnessed the rape, their testimony is once again circumstantially consistent with a verdict of rape.
The non-hearsay portion of the testimony of the victim's mother confirmed the fact that she found the victim semi-nude, crying, and hysterical under conditions circumstantially suggestive of rape.
Significantly, the victim positively identified the defendant.
In the Peters case there were no other witnesses to connect the defendant with the crime. The jury's decision in Peters had to be based virtually exclusively on the testimony of the retarded victim, as distinguished from this case where the testimony and evidence supporting the victim's accusation was substantial. We are particularly impressed by the fact that the only noteworthy feature of the erroneously admitted testimony in this case was the admirable restraint exercised by the prosecutor in her questioning of the victim's mother and the remarkably terse and dispassionate nature of her responses. There was nothing extraordinary about the testimony or the emphasis given it by the prosecutor in her questioning that would have given it an exaggerated prominence in the minds of the jury. There appear to have been no emotional outbursts, no inflammatory language, and no lurid, graphic, or gruesome descriptions or terminology used by the victim's mother or the prosecutor that could have inflamed the passions of the jury and swayed their emotions. In fact, the entire case was presented in a very rational and unemotional way. We are convinced beyond a reasonable doubt that the jury made a very rational decision that would have remained unchanged absent the mother's testimony.
We are convinced beyond a reasonable doubt that the hearsay testimony of the victim's mother did not contribute to the jury verdict's. Its admission was harmless error. It is hard to see how the absence of that portion of the testimony would have weakened the state's case. It was superfluous and cumulative in virtually all respects. In fact, if all of the mother's testimony had been excluded in its entirety, including the non-hearsay portions, the jury would have still reached the same verdict!
For the foregoing reasons, we affirm.
AFFIRMED.