644 So.2d 1093 (1994)
STATE of Louisiana
v.
Albert P. GIBSON, III.
No. 93-KA-0305.
Court of Appeal of Louisiana, Fourth Circuit.
October 13, 1994.
*1095 Merlis J. Broussard, Jr., Port Sulphur, for defendant.
Before SCHOTT, C.J., and BYRNES and WALTZER, JJ.
BYRNES, Judge.
Albert P. Gibson, III appeals his conviction of second degree murder in violation of LSA-R.S. 14:30.1, for which he was sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. We affirm.
On the morning of October 25, 1991, when Kerry Turner went to Randy Lightell's trailer in Port Sulphur in Plaquemines Parish, he opened the door and saw a puddle of blood. Going to the next trailer where Wanda Ragas lived, he told Wanda, Judith Williams, and Randa Ragas what he found. Returning to Lightell's trailer, the four witnesses saw blood on the bed as well as the hallway and found Randy Lightell's body lying on the kitchen floor. Wanda Ragas testified that she heard gun shots around midnight that previous night.
When the police arrived and secured the scene, Detective Charles Guey of the Plaquemines Parish Sheriff's Office obtained a search warrant. Evidence collected from the trailer, including four .45 caliber casings and two .45 caliber slugs, as well as blood samples, were sent to the Jefferson Parish Crime Lab.
Upon further investigation, the officers learned that Tillman Bean lent Harold Grant a .45 caliber Star automatic pistol around October 20, 1991. Bean supplied the police officer with a spent casing and identified the weapon and casing at trial.
Harold Grant testified that he lent the .45 caliber weapon to the defendant and Adonis Ducro around 11:00 p.m. on October 24, 1991. Grant related that he was in shock and did not believe them when Gibson and Ducro announced that they wanted to borrow the gun to kill Randy Lightell.
After Gibson and Ducro were arrested on the evening of October 25, 1991, Detective Guey informed Gibson of his Miranda rights and Gibson gave a taped statement in which he acknowledged his participation in the murder of Randy Lightell. According to Gibson, he and Ducro went to the trailer and asked Lightell if he had any dope. When Lightell gave a negative answer, Ducro shot him twice and then Gibson shot Lightell twice with the same gun. They ran out, and Gibson indicated that he threw the gun in a grassy area near the decedent's trailer.
Detective Ernie Davis of the Plaquemines Parish Sheriff's Office obtained a second taped statement from the defendant after advising the defendant of his Miranda rights later on the evening of October 25, 1991. The defendant stated that another person, Roderick Parker, was with Ducro and him when they killed Lightell although Parker did not fire the gun. Gibson also stated that he and Ducro put socks on their hands to avoid putting fingerprints on the gun. Gibson admitted that he buried the gun in his father's backyard where it was later recovered by the police.
The defendant was indicted with the second degree murder of Randy Lightell. After the defendant entered a plea of not guilty and not guilty by reason of insanity, the trial court granted the defendant's motion for the appointment of a sanity commission. The trial court selected two clinical psychologists, Dr. Raphael Salcedo and Dr. Paul Kantack, to evaluate the defendant. Upon examining the defendant on February 7, 1992 and July 15, 1992, they found that the defendant was competent to stand trial and that he was sane at the time of the murder. Dr. Salcedo determined that the defendant had an I.Q. of 64. Dr. Salcedo noted that the defendant stated that he wore socks on his hands to *1096 avoid getting fingerprints on the gun and that he buried the weapon, indicating that the defendant knew right from wrong by trying to cover up the crime.
The trial court denied the defendant's motions to suppress the confessions and evidence.
Dr. Susan Garcia, a forensic pathologist with the Jefferson Parish Coroner's office, who performed the autopsy, testified that the cause of Randy Lightell's death was multiple gunshot wounds, namely two lethal wounds to the chest and abdomen.
Louise Walzer, assistant director and senior firearms examiner of the Jefferson Parish Sheriff's Office's Crime Laboratory, testified that the slugs and casings found at the crime scene and the bullets taken from the decedent's body were fired from the .45 caliber Star automatic pistol.
Mary James Gibson testified that she saw her son, the defendant, around 11:00 p.m. on October 24, 1991. His eyes were red and half closed. He was acting nervous, kept pacing across the room, and looked scared. When the telephone rang around 11:13 p.m., the defendant answered the phone, put it down and ran out of the house. The defendant returned around 1:00 a.m. the next morning on October 25, 1991. Mrs. Gibson also related that although the defendant was a slow learner and had trouble in academic subjects, he won football trophies and played on the basketball team in school. After the defendant repeated the ninth grade three times, he quit school. She knew that the defendant was a heavy drinker, but did not know if he used drugs.
Adonis Ducro, Taris Autmon, Elton Edgerson, and the defendant's sister, Sarah Gibson Eason, also testified as character witnesses for the defense. Because Ducro asserted his Fifth Amendment right against self-incrimination, his testimony was limited to his statement that he knew the defendant for a long time as they had gone to school together. Having known the defendant for 14 years, Autmon related that the defendant did not graduate from high school. Autmon stated that the defendant drank alcohol and used drugs, namely marijuana. Having known the defendant in school, Elton Edgerson had seen the defendant tipsy, but not drunk. He stated that the defendant also used drugs, namely clickums and marijuana. Sarah Gibson Eason testified that the defendant was slow with his work and had trouble in school. She stated that she had seen her brother drunk and knew that he used drugs.
Dr. Armond Devezine, a clinical psychologist, testified on behalf of the defendant. In his evaluation, he found that the defendant had an I.Q. of 62 and was mildly mentally retarded, enabling him to achieve between the fifth and sixth grade levels. Although Dr. Devezine stated that the defendant's history of substance abuse would aggravate his condition in that the use of alcohol and drugs could lower his inhibitions and control, Dr. Devezine acknowledged that mild mental retardation does not prevent one from distinguishing right from wrong. Dr. Devezine noted that the defendant's responses were logical, coherent and intelligent.
Dr. Denis Franklin, a specialist in neurology and psychiatry, also testified on behalf of the defendant. Noting that the defendant was not overtly psychotic, Dr. Franklin found that the Gibson was mildly mentally retarded and had a history of substance abuse. The defendant told Dr. Franklin that he drank heavily and frequently used clickums. Relating that the use of alcohol and drugs could impair the judgment of one who is mildly mentally retarded, Dr. Franklin testified that mental retardation is considered a mental defect, and drug abuse is considered a mental disease. Dr. Franklin stated that if a patient is blatantly psychotic, he would be unable to distinguish right from wrong. The defendant could have been in such a state the night of the murder if he consumed adequate amounts of alcohol and/or other mind altering drugs. Dr. Franklin could not determine whether the defendant was sane or insane at the time of the commission of the crime, but found that the defendant was competent to assist counsel at trial.
According to Dr. Franklin, a psychotic person could not give two consistent statements 20 hours after the alleged incident unless the person had a fixed delusion. In that case, the statements would be consistent, but "off *1097 the wall". If the person's statements were accurate, the possibility of psychosis would be lowered.
On July 25, 1992, the jury found the defendant guilty as charged. On September 22, 1992, the trial court sentenced the defendant to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence, and the defendant's appeal followed.
Albert Gibson argues that: (1) because of his diminished mental capacity he did not knowingly and intelligently waive his rights when he gave his statements to the police; and (2) the trial court erred in failing to allow him to introduce evidence on the defense of intoxication.
Initially at issue is whether the defendant had a diminished mental capacity, which vitiated a knowing and voluntary waiver of his constitutional rights when he gave his two statements to the police.
The state is not required to negate the defendant's abnormality but must prove beyond a reasonable doubt that the defendant's statements were voluntary. State v. Ashworth, 554 So.2d 271 (La.App. 3d Cir. 1989), writ denied 561 So.2d 113 (La.1990). Because of the statutory presumption of sanity and that one is responsible for his actions, the defendant has the burden of proving a mental defect which renders him unable to understand his rights and therefore incompetent to waive them. State v. Bordelon, 597 So.2d 147 (La.App.3d Cir.), writ denied 600 So.2d 678 (La.1992). In reviewing the trial judge's ruling as to the admissibility of a confession, his conclusions on credibility are entitled to the respect due those made by one who saw the witnesses and heard them testify. State v. Rodrigue, 409 So.2d 556 (La.1982). The testimony of police officers alone can be sufficient to prove the defendant's statements were freely and voluntarily given. State v. Pittman, 585 So.2d 591 (La.App. 5th Cir.), writ denied 586 So.2d 545 (La.1991). Low intelligence does not in and of itself vitiate the defendant's ability to knowingly and intelligently waive constitutional rights and make a free and voluntary confession. State v. Brooks, 541 So.2d 801 (La.1989). Expert opinions on the question of the waiver of constitutional rights might be helpful but are not binding on the court; much weight is accorded the trial court's assessment of the defendant's intellectual ability to understand and waive his constitutional rights. State v. Lefevre, 419 So.2d 862 (La.1982); State v. Boothe, 532 So.2d 203 (La.App. 3d Cir.1988).
The standard of competency for pleading guilty or waiving the right to counsel is the same as the defendant's competency to stand trial, and is not a higher standard. Godinez v. Moran, ___ U.S. ___, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993). In that case, the United States Supreme Court stated:
... And while the decision to plead guilty is undeniably a profound one, it is no more complicated than the sum total of decisions that a defendant may be called upon to make during the course of a trial.... [W]e can conceive of no basis for demanding a higher level of competence for those defendants who choose to plead guilty ...
Nor do we think that defendant who waives his right to the assistance of counsel must be more competent than a defendant who does not, since there is no reason to believe that the decision to waive counsel requires an appreciably higher level of mental functioning than the decision to waive other constitutional rights....

Godinez v. Moran, supra, ___ U.S. at ___, 113 S.Ct. at 2686.
See also DeVille v. Whitley, 21 F.3d 654 (5th Cir.1994). The waiver of the defendant's constitutional rights in making a confession or statements does not require a higher level of mental capacity than his level of competency to enter a plea of guilty, to assist counsel at trial, to waive his right to an attorney, or to waive other constitutional rights.
Although Dr. Franklin could not determine whether the defendant was sane at the time of the commission of the crime, he found that the defendant was competent to assist counsel at trial. Drs. Salcedo and Kantack found that the defendant was sane at the time of the commission of the crime and was competent *1098 to stand trial, indicating that the defendant understood his waiver of rights when he gave his statements.
None of the doctors testified that the defendant's mental capacity prohibited him from understanding and waiving his rights. The police officers explained to the defendant the constitutional rights which he was waiving, and the police sought to insure that the defendant understood those rights. Detective Guey asked the defendant if he understood each right and to state in his own words what each right meant to him. When asked by Detective Guey whether he had any trouble reading or writing and whether he wanted an attorney, the defendant responded in the negative.
Further, Detective Guey, Chief of Detectives Rene Coludrovich, and Investigator Sadie Williams were present when the defendant was interrogated. Officers Coludrovich and Williams were present when the defendant gave his first statement to Detective Guey and when the defendant gave his second statement to Detective Davis. According to Detective Davis, the defendant wanted to give the second statement after speaking with his father. The officers testified that the defendant did not appear intoxicated or under the influence of drugs. No promises, coercion or threats were used to obtain the statement. The officers testified that the defendant appeared to be normal and to understand his rights.
Under the totality of circumstances, the trial court did not err in denying the motion to suppress the defendant's statements. The state made an affirmative showing that the defendant knowingly and intelligently waived his constitutional rights and made free and voluntary statements.
Albert Gibson also argues that the trial court erred in sustaining the state's objection to the introduction of evidence on the defense of intoxication.
LSA-C.Cr.P. art. 726 provides:
A. If a defendant intends to introduce testimony relating to a mental disease, defect, or other condition bearing on the issue of whether he had the mental state required for the offense charged, he shall not later than ten days prior to trial or such reasonable time as the court may permit, notify the district attorney in writing of such intention and file a copy of such notice with the clerk. The court may for cause shown allow late filing of the notice or grant additional time to the parties to prepare for trial or make such other orders as may be appropriate.
B. If there is a failure to give notice as required by Subsection A of this Article, the court may exclude the testimony of any witness offered by the defendant on the issue of mental condition.
The purpose of article 726 and the other discovery rules in the Louisiana Code of Criminal Procedure is to eliminate unwarranted prejudice which could arise from surprise testimony. State v. Trahan, 576 So.2d 1, 6 (La.1990). LSA-R.S. 14:15 states that "[w]here the circumstances indicate that an intoxicated or drugged condition has precluded the presence of a specific criminal intent or of special knowledge required in a particular crime, this fact constitutes a defense to a prosecution for that crime." Thus, intoxication is an "other condition" bearing on the issue of whether the defendant had the mental state for the offense charged. State v. Trahan, supra.
In the present case, the state filed a motion for discovery on January 6, 1992 in which it requested notice of the defendant's intent to pursue any defenses concerning the defendant's mental state. Defense counsel did not file any such written notice until July 22, 1992, the morning of trial. The state received oral notice of the defendant's intent on July 21, 1992 during jury voir dire when defense counsel attempted to question the prospective jurors on the issue of intoxication. When defense counsel filed its notice of intent on the first day of trial, the state objected. The trial court indicated that it would not rule on the matter until the defendant actually attempted to introduce evidence on the defense of intoxication. Prior to defendant's expert witnesses testifying in front of the jury, the trial court heard proffered testimony from the defendant's experts witnesses and oral argument from counsel on the defense of intoxication.
*1099 Defense counsel argued that they only became aware of this defense after receipt of the reports of Drs. Franklin and Kantack, who later related that the defendant told Drs. Franklin and Kantack that he drank alcohol and smoked clickums the night of the murder. However, the trial court noted that such information was available to the defense prior to the rendition of the experts' reports. This information could have been obtained from the defendant. After hearing the proffered testimony, the trial court permitted the introduction of evidence of substance abuse in support of defendant's argument that he was insane at the time of the offense, but the trial court prohibited evidence that the defendant was intoxicated on the night of the murder. Considering that defense counsel failed to comply with the requirements of LSA-C.Cr.P. art. 726, and the evidence was available to the defendant prior to the rendition of the experts' reports, the trial court was within its discretion in refusing to allow the defendant to introduce evidence concerning the defense of intoxication.
Accordingly, the defendant's conviction and sentence are affirmed.
AFFIRMED.