713 So.2d 1168 (1998)
STATE of Louisiana
v.
Samuel D. ATKINS.
No. 97-KA-1278.
Court of Appeal of Louisiana, Fourth Circuit.
May 27, 1998.
*1170 Yvonne Chalker, Louisiana Appellate Project, New Orleans, for Defendant/Appellant Samuel D. Atkins.
Harry F. Connick, District Attorney, Karen Godail Arena, Assistant District Attorney of Orleans Parish, New Orleans, for Appellee The State of Louisiana.
Before SCHOTT, C.J., and LOBRANO and MURRAY, JJ.
MURRAY, Judge.
Defendant, Samuel Atkins, was charged by grand jury indictment with a charge of aggravated rape, a violation of La.Rev.Stat. 14:42. Following trial by a twelve-person jury, he was found guilty of the lesser charge of forcible rape, and was thereafter sentenced to serve twenty years at hard labor, without benefit of probation, parole or suspension of sentence. He appeals that conviction.

STATEMENT OF THE FACTS:
On the afternoon of Sunday, August 4, 1997, the victim, F.H.,[1] a sixteen-year-old female, was at home in her mother's residence.[2] Her mother, Martha; her seventeen-year-old brother, Earl; and Mr. Atkins, Martha's husband, were also at home. All testimony confirmed that Martha, Mr. Atkins, and Earl were drinking and watching television in the living room. According to Martha's testimony, at approximately 4 p.m., she heard some noise upstairs, but assumed it was Earl and the victim wrestling. She then saw Earl and Mr. Atkins coming down the stairs, struggling. Mr. Atkins ran outside the door with Earl following him. When Earl returned inside he told Martha that "Sam was messing with [F.H.]. I'm fixing to call the police." The police came a few minutes later.
F.H. testified that she had been outside playing most of the afternoon. When she came in she saw her mother sleeping on the sofa, so she went upstairs. Mr. Atkins followed *1171 her into her bedroom. She testified that once inside her bedroom, he told her: "You better give it to me." She replied "No." He slapped her and told her he would kill her if she did not "give it up to him." He took her shorts and his pants off, then threw her on the bed and put his hands around her neck, scratching her. He then told her that if she did not let him put "it" in her he would put "it" in her mouth. He told her to get on her knees and then raped her vaginally. F.H. indicated that Mr. Atkins did not ejaculate. Earl came into the room, and she heard Mr. Atkins say, "Ha, ha, I raped your sister." She pulled up her shorts, and went downstairs.
Earl testified that he had also fallen asleep downstairs, but decided to go up to his room. As he entered, he saw Mr. Atkins on top of his sister engaging in intercourse. He said both his sister and Mr. Atkins had shirts on, but their pants were down to their ankles. Earl pulled Mr. Atkins off of his sister. Mr. Atkins pulled up his pants, and as he ran downstairs said, "Guess what, I fed your sister. Ha, ha, ha." Earl said F.H. looked scared and upset and had scratches on her neck and face. Earl ran downstairs, told his mother what happened, and called the police. He said Mr. Atkins twice tried to pull the phone from him, so he struck him. After the second blow, Mr. Atkins ran from the house. The police came and Earl related what had happened. Earl testified that his sister told him that Mr. Atkins had threatened to kill her if she told anyone about the attack.
New Orleans Police Officer Gary DeGruy testified that upon his arrival at the scene the victim was upset and crying, and was unable to tell him what had happened, so the brother related the story to him. He observed scratches on the front and sides of F.H.'s neck and, at trial, identified crime lab photographs depicting those injuries.
Dr. Jennifer Miles performed a full physical examination on the victim the day of the crime. Dr. Miles observed some welts on the victim's neck consistent with choking. A pelvic exam revealed increased secretions around the outside of the victim's vagina and a small tear at the lower part of the entrance to the vagina. Dr. Miles testified a tear that size, two millimeters, would not persist more than a day or two and opined that the tear was no more than a couple of days old. She said the tear would be consistent with forcible sexual intercourse. No motile sperm were found, and Dr. Miles testified the victim related that the person who raped her did not ejaculate.
Howard Grant, the victim's grandfather, testified that he began looking for Mr. Atkins with the intention of holding him until the police could arrive to arrest him. He and two companions found Mr. Atkins the next morning at a bar. Mr. Atkins left the building through a rear door and Mr. Grant followed him in his truck. He caught up with Mr. Atkins, after telephoning police on his cellular phone, "scuffled" with him, and detained him until police arrived. Mr. Grant testified that Mr. Atkins repeatedly said he was sorry for what he had done and that he needed help.
Officer Ricky Bruce testified that on August 5, 1996, he answered a call of a fight, and found Mr. Atkins on the ground "pretty well beaten up." Mr. Grant told Officer Bruce that Mr. Atkins was wanted for rape, so he placed Mr. Atkins in the rear of his police car, and read him his rights. Officer Bruce said Mr. Atkins made the statement that "he was sick and [police] needed to lock him up."
Det. Edward Cooper, assigned to the New Orleans Police Department's Child Abuse section, obtained statements from the victim and her brother, Earl, on the day of the rape. He observed welts and scratches around the victim's neck and, at trial, identified photographs depicting those injuries. Detective Cooper stated that the victim appeared to have a "somewhat diminished mental capacity." The next day, Det. Cooper was returning to the victim's neighborhood in an attempt to locate Mr. Atkins, when he saw Officer Bruce driving in the opposite direction. When Det. Cooper realized that the man in Officer Bruce's car was Mr. Atkins, he informed Mr. Atkins that he was under arrest for the rape, and advised him of his rights. Mr. Atkins then confessed to the crime. Det. Cooper had Mr. Atkins transported to Charity Hospital for treatment of *1172 the injuries he sustained in the scuffle with Mr. Grant.
It was stipulated that no physical evidence obtained from the victim  vaginal swabs, vaginal smears, and pubic hair combings  were connected to Mr. Atkins.
Mr. Atkins testified that he and the victim were only wrestling when Earl came into the room. He said he and F.H. had all of their clothes on. He denied the crime itself and to threatening F.H. in any way. He admitted that he had been drinking heavily all day. He said he might have grabbed F.H. around the neck, and that he possibly choked her, but could not remember because he was drunk. Mr. Atkins admitted to two prior convictions: one for simple robbery, and one for carnal knowledge of a juvenile. He admitted to making statements to the police officers, but that he only did so because he was sitting in the police car and wanted "to get them to take me from around the area." When asked if he made a statement to Det. Cooper about raping the victim, he replied: "I didn't say nothing about no rape."

DISCUSSION

Errors Patent Review:
A review of the record for errors patent reveals none.

Assignment of Error No. 1:
In his first assignment of error, Mr. Atkins argues that the trial court erred in denying his pretrial motions to suppress the inculpatory statements allegedly made by him to Howard Grant and Officer Ricky Bruce at the time of his arrest, as well as the confession to Det. Edward Cooper while in the rear of Officer Bruce's police car.
La.Rev.Stat. 15:451 provides:
Before what [purports][3] to be a confession can be introduced in evidence, it must be affirmatively shown that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises.
State v. Sepulvado, 93-2692, p. 4 (La.4/8/96), 672 So.2d 158, 163, cert. denied, Sepulvado v. Louisiana, ___ U.S. ___, 117 S.Ct. 310, 136 L.Ed.2d 227 (1996); State v. Hohn, 95-2612, p. 3 (La.App. 4 Cir. 1/19/96), 668 So.2d 454, 456. The State has the burden of proving the admissibility of a purported statement or confession at a motion to suppress hearing. La.Code Crim. Proc. art. 703(D). State v. Sepulvado, supra; State v. Hohn, supra. These rules apply whether the statement is made to an agent of the State or a private citizen. See State v. Martin, 94-252, p. 3 (La.App. 5 Cir. 10/12/94), 645 So.2d 752, 754, writ denied, 94-2787 (La.3/10/95), 650 So.2d 1174. "The testimony of police officers alone can be sufficient to prove the defendant's statements were freely and voluntarily given." State v. Gibson, 93-0305, p. 6 (La.App. 4 Cir. 10/13/94), 644 So.2d 1093, 1097. To establish the admissibility of a statement made by an accused person pursuant to custodial interrogation, the State must prove that the accused was advised of his Miranda rights, and that he waived those rights prior to interrogation. State v. Bell, 613 So.2d 744, 746 (La.App. 4 Cir.1993).
In determining the voluntariness of a statement, the trial court must review the totality of the circumstances. State v. Sepulvado, supra; State v. Dunn, 94-776, p. 15 (La.App. 5 Cir. 2/15/95), 651 So.2d 1378, 1387. A trial court's determination as to the admissibility of a statement is within the discretion of the trial court and its decision will not be disturbed unless unsupported by the evidence. State v. Tart, 93-0772, p. 23 (La.2/9/96), 672 So.2d 116, 126, cert. denied, Tart v. Louisiana, ___ U.S. ___, 117 S.Ct. 310, 136 L.Ed.2d 227 (1996); State v. Samuels, 94-1408, p. 7 (La.App. 4 Cir. 6/7/95), 657 So.2d 562, 566. A trial court's conclusions as to the credibility and weight of the testimony relating to the voluntariness of the statement will not be overturned unless they are not supported by the evidence. State v. Brooks, 505 So.2d 714, 721 (La.1987), cert. denied, Brooks v. Louisiana, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987).
The State filed its notice of intent to use statements/confessions made by Mr. Atkins to Howard Grant and Det. Cooper. At trial, both of these witnesses testified that Mr. Atkins had made inculpatory statements.
*1173 In addition, Officer Bruce testified about an inculpatory statement made by Mr. Atkins. At the hearing on the motion to suppress, the State presented evidence  the testimony of Det. Cooper himself  concerning only the statement to Det. Cooper, not as to any statements made to Mr. Grant or Officer Bruce. The trial court ruled that the statement given to Det. Cooper was freely and voluntarily given. At trial, when Mr. Grant and Officer Bruce testified concerning the statements to them, counsel for Mr. Atkins did not object to the failure of the State to establish they had been given freely and voluntarily prior to the State introducing them. Mr. Atkins cannot now raise this failure as error, since no contemporaneous objection was made at trial. La.Code Crim. Proc. art. 841(A). Moreover, because the record supports that all of the statements were given freely and voluntarily in accordance with La.Rev.Stat. 15:451, any such failure to technically comply with the foundation requirements of the statute was harmless error. See State v. Huntley, 438 So.2d 1188, 1194-1195 (La.App. 3 Cir.1983).

Statements to Howard Grant
Mr. Grant testified as to a statement made by Mr. Atkins:
Q What happened after the police arrived?
A Well, the police came and I think his name is Bruce, I think his name was, but anyway, when he came, he immediately handcuffed him after he was telling us about he needed help and what-have you and he was sorry for what he did.
Q Who said that?
A Sam.
Q And what exactly did he say?
A He was saying he was sorry for what he had did. And so he toldhe said he was needing help and the police was reading him his rights. Before they put him in the patrol
Q Do you knowI'm sorry. Go ahead.
A And then that's when the police handcuffed him, asked him was his hands all right. He said, "Yeah," and they put him in the car. He was telling the police the same thing he was telling me, he needed help.
Q That he needed help. Do you know what he meant by that?
A No, all I know is he needs help, I guess, for what he had did, I guess.
Q Did he ever mention [the victim's] name?
A Not that I recall.
Q Did he refer to her at all?
A Not that I can recall.
Q How many times did he say that he needed help, that he was sorry for what he did? Do you remember?
A Quite a few times. He repeated it several times.
Q Did he say anything else?
A Not that I can recall.
Q Did Mr. Atkins apologize to you?
A Yes, he did. He kept apologizing.
As set forth above, the evidence shows that Mr. Grant, the victim's grandfather, went searching for Mr. Atkins with two other men. Mr. Grant admittedly "scuffled" with Mr. Atkins, and Mr. Atkins testified one of the men hit him in the head with a baseball bat. Officer Bruce advised Mr. Atkins of his rights before placing him in his police car, and Det. Cooper again read his rights to him before transporting him to Charity Hospital for treatment of the injuries sustained in the scuffle with Mr. Grant. From the testimony, it appears that Mr. Atkins made statements continually from the time the police arrived through the time he was taken to Charity Hospital.
Mr. Atkins claims, however, that the above statements were coercively obtained from him by Mr. Grant and the other men, and, therefore, should not have been allowed as evidence. There is no question that Mr. Atkins received some injuries at the hands of Mr. Grant and possibly one of the other men. Although Mr. Atkins was in an emotionally charged situation, the evidence indicates that the police had arrived, and he was no longer in danger from the vigilantes at the time he made the voluntary and spontaneous inculpatory statements. There is no indication that Mr. Grant, who had no doubt that Mr. Atkins *1174 had raped his granddaughter, sought to elicit an admission of guilt. The totality of the circumstances establishes that the statements were made by Mr. Atkins freely and voluntarily. See State v. Smith, 407 So.2d 652, 654-655 (La.1981) (statement made by supposed intoxicated defendant as he sat handcuffed in rear of police car, bleeding from police dog bites, was voluntary).
Assuming Mr. Atkins made statements to Mr. Grant while he was in the custody of Officer Bruce before he could be advised of his Miranda rights, a voluntary, spontaneous statement is admissible without Miranda warnings, even if the defendant is in custody when the statement is made. State v. Lee, 95-1398, p. 2 (La.App. 4 Cir. 8/23/95), 660 So.2d 911, 913.

Statement to Officer Bruce
Mr. Atkins also made statements to Officer Bruce in the presence of Mr. Grant, as reflected by Mr. Grant's testimony quoted above. To support his position that the statements should not have been allowed into evidence, Mr. Atkins quotes testimony by Officer Bruce:
Q And was Mr. Atkins making any statements to you at that time?
A Yes.
Q What was he saying?
A He said that he was sick and he needed to go to jail and he wanted me to take him to jail, that he tried to turn himself in on a previous day at Central Lockup and they wouldn't accept him.
I advised him of his rights and told him he was going to the  we were gonna have to take him to Charity Hospital because he had some injuries and they wouldn't accept him at the lockup. He didn't want to do that, he wanted to go straight to jail and he wanted us to lock him up for the rest of his life.
Mr. Atkins makes the same argument as he did regarding the statement to Mr. Grant  that the above statement was not freely and voluntarily given, but was the product of coercion, threats and physical violence at the hands of Mr. Grant and his acquaintances. He also notes that the statements to Officer Bruce were given prior to being advised of his Miranda rights. These arguments have no merit for the reasons set forth above.

Statement to Det. Cooper
Mr. Atkins cites the following testimony from Det. Cooper's testimony at trial:[4]
Q And did you have any contact with Mr. Atkins at that time?
Q Yes, I did. I approached the police car, opened the back door, and I talked to the defendant, advised him that he was under arrest, what the charge was, and of his Miranda warning.
Q And did Mr. Atkins appear to understand his rights?
A Yes, he did.
Q And did he make any statements in your presence with regard to the incident?
A Yes, he did. He said that he knows that he had intercourse with his stepdaughter and that he was wrong for that and he needs help.
Q Do you recall his exact words?
A Not verbatim, no.
Q And at that point, what occurred? What did you do?
A Well, he had been injured in a scuffle with witnesses who were detaining him for the police so I had him transported to Charity Hospital for treatment of the injuries. Officer Bruce handled that. I went to the child abuse office, typed out the arrest report, and had him transported to the lockup once he was treated and released.
At the motion to suppress hearing, Det. Cooper's testimony was essentially the same as it was at trial. He noted that he advised Mr. Atkins of his rights from memory, that Mr. Atkins appeared to understand those rights, that Mr. Atkins admitted he was wrong for having sex with his stepdaughter, but that he could not help himself and needed some help. On cross-examination, Det. *1175 Cooper stated that he did not detect the odor of alcohol on Mr. Atkins' breath.
Mr. Atkins denies making the confession to Det. Cooper. He further argues, again, that any statements he did make were not freely and voluntarily given. For the reasons given above, the trial court did not abuse its discretion by finding that Mr. Atkins' confession to Det. Cooper was freely and voluntarily given.

ASSIGNMENT OF ERROR NO. 2:
In his second assignment of error Mr. Atkins argues that the trial court erred in allowing the victim to testify because she was incompetent and her testimony was improperly coached. La.Code Evid. art. 601 provides the general rule of competency:
Every person of proper understanding is competent to be a witness except as otherwise provided by legislation.
A key determination to be made is whether the witness is able to understand the difference between truth and falsehoods. State v. Doss, 522 So.2d 1274, 1279 (La.App. 5 Cir.), writ denied, 530 So.2d 563 (La.1988). However, the trial court's determination of competency of a child witness is based not only upon a child's answers to questions testing her understanding, but also upon the child's overall demeanor. State v. Troulliet, 94-183, p. 4 (La.App. 5 Cir. 9/14/94), 643 So.2d 1267, 1270. Whether a child has been coached is one factor to be considered by a trial court in ruling on competency. See State v. Crandell, 604 So.2d 123 (La.App. 2 Cir. 1992). Because of a trial court's opportunity to see and hear the witness, the court's determination of competency should not be disturbed on appeal unless it is clearly wrong. State v. Bean, 582 So.2d 947, 952 (La.App. 2 Cir.), writ denied, 586 So.2d 567 (La.1991).
The State was questioning the victim about telling the truth when the defense objected and asked for an investigation to determine whether the witness was competent. The trial court denied the request at that time and allowed the State to continue in its direct examination. During questioning by defense counsel, the victim was questioned about talking to prosecutors and about her understanding of right and wrong:
Q. And you talked to the district attorney right here about this case?
A Yeah.
Q You know who the district attorney is?
A Who?
A Do you know/
A Those two ladies?
Q Those two ladies right there.
A Yeah.
Q Are they district attorneys?
A Yeah.
Q Did they talk to you about this case?
A Uh-huh (affirmative response).
Q How may times?
A About five days.
Q Five days?
A Yeah.
Q And how long did they talk to you each one of those days?
A Huh?
Q How long did they talk to you each one of those days?
A About 11.
Q About 11?
A Yeah. Days.
Q Eleven days?
A Yeah.
Q [F.H.], let me ask you this. Do you know the difference between right and wrong?
A Yeah.
Q What's the difference?
A Right when you do right; wrong when you do wrong.
Q What would happen to you if you did wrong?
A It would go be my fault.
Q Go where?
A It was gonna be my fault if I said the wrong things.
* * * * * *
Q Well, what is it about saying the wrong thing? Why don't people say the wrong thing? Why are they supposed to say the right thing?
A Because if you don't say the right thing, it's your fault. If you say the rightno, if *1176 you sayif you say the right thing, it's their fault.
Q It's their fault.
A Yeah.
Q Who told you that?
A Nobody.
Q Nobody told you that?
A No.
Q How about these two ladies over here [the prosecutors]? Did they tell you anything about what's right and wrong?
A Yeah.
Q What did they tell you?
A They told me wrong, it's their fault, right is not.
(The court reporter asks the witness to repeat)
Wrong is their fault and right was our fault.
Q What about the doctor? Did the doctor tell you anything about between right and wrong?
A Yeah. Right and wrong means
(The court reporter asks the witness to repeat)
Wrong means don't have sin and right means
(The court reporter asks for clarification)
Yeah.
Mr. Atkins argues these responses by the victim show that she was coached by the State and is incompetent to testify. In response to questioning by the State, the victim gave her age as fifteen, although it was sixteen at the time of trial, she told the court where she went to school, and that math was her favorite subject. The victim's mother testified that the victim was in special education and was in the seventh grade when she should have been in the ninth grade. The victim stated she knew the difference between telling the truth and telling a lie. She explained that when you do not tell the truth you go to jail, and that she was going to tell the truth in court. She was obviously confused during her cross-examination by defense counsel. However, one might expect a sixteen-year-old special education student to be nervous about testifying that her stepfather raped her. It is also obvious, and expected, that the victim talked to prosecutors during the investigation of the case and during preparation for trial. However, the remainder of F.H.'s testimony revealed that she was quite clear on the facts surrounding the rape itself. She used graphic slang to describe her stepfather's actions, language not likely used by the prosecutors in any "coaching sessions." There was an apparent discrepancy between her testimony and that of her brother in that she said she was raped while on the floor on her knees, while her brother testified he saw her being raped on the bed.
In State v. Linson, 94-0061 (La.App. 1 Cir. 4/7/95), 654 So.2d 440, writ denied, 95-1120 (La.9/22/95), 660 So.2d 470, the court affirmed the trial court's finding that an eight-year-old girl was competent to testify even though she twice admitted that it was acceptable to lie if somebody she loved asked her to, and that her mother had told her how to behave in court, though not what to say. The defendant was charged with indecent behavior with a juvenile. The court noted that the child was able to give examples of a lie; said she believed in God and knew God wanted her to tell the truth; understood the meaning of the oath given to witnesses; was able to describe what occurred during a trial and knew that a witness had to tell the truth. The trial court also found the girl's seven-year-old sister competent based on virtually the same evidence.
In State v. Crandell, supra, the appellate court affirmed the trial court's finding that a nine-year-old male witness to a murder was competent to testify, who testified that a lie was something that would get a person in trouble, and that the truth was something that helped a person. The boy also stated he would get into trouble if he did not tell the truth, and that the truth was "good" while a lie was "bad."
In State v. Troulliet, supra, the appellate court affirmed the trial court's finding that a seven-year-old victim of sexual assault was not competent to testify. The child testified as to what grade she was in, what school she attended, and stated she knew the difference *1177 between telling the truth and telling a lie, and said that she never told lies. However, two child psychiatrists testified as to the child's behavior; one said the child had trouble understanding the difference between a truth and a lie, and the other said that the child was prone to lie.
Considering the facts of the instant case, we find that the trial court did not abuse its discretion in finding the victim to be a competent witness, capable of distinguishing between right and wrong, and telling the truth versus telling a lie. The victim's credibility was a question for the jury.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 3:
In this assignment of error, Mr. Atkins argues that the trial court erred in admitting into evidence, over the objection of defense counsel, Det. Cooper's testimony as to what the victim told him when he interviewed her on the afternoon of the alleged rape. The following brief colloquy occurred between Det. Cooper and the prosecutor:
A And she told me that her step-dad raped her.
Q And did she use those words?
A No, not exactly. She said that her step-dad, DanDanny or Daniel, which she referred to him as, told her to go upstairs in her room and she went upstairs and he followed in behind her and told her to take off her clothes. Initially, she refused and he grabbed her and threatened to kill her and forced her to take her clothes off. He strangled her, grabbed her around the neck, pushed her down on the bed and put his penis in her vagina. And she said through [sic] the course of that conversation that he didn't come.
There appears to be no dispute that Det. Cooper's testimony concerning the substance of the victim's statement was hearsay. La. Code Evid. art. 801(C). The State argues, however, that the testimony was admissible pursuant to La.Code Evid. art. 801(D)(1), (4) which provides:
(1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is:
* * * * * *
(d) Consistent with the declarant's testimony and is one of initial complaint of sexually assaultive behavior.
The victim's mother testified that the victim told the first police to respond that Mr. Atkins "was messing with her." This was before Det. Cooper arrived at the scene and obtained information from the first officers on the scene. After getting that information he spoke with the victim and her brother. The victim's brother also testified he spoke with his sister about the alleged assault when police were there.
The State inasmuch admits that the statement to Det. Cooper was not the initial complaint of the alleged rape, arguing that the complaint need not be the very first statement made if the first statements were without particulars, citing State v. Free, 26,267 (La.App. 2 Cir. 9/21/94), 643 So.2d 767, writ denied, 94-2846 (La.3/10/95), 650 So.2d 1175. In Free, the court found that a report of sexual abuse by an eight-year-old victim to her mother was not the initial report contemplated by La.Code Evid. art. 801(D)(1)(d), because the mother could discern no "particulars" due to the child's crying and inability to communicate at that time. However, this court has strictly limited the term "initial complaint" to its narrow literal meaning  the "first" or "original" complaint. State v. Henderson, 607 So.2d 733, 735 (La.App. 4 Cir.1992).
In the instant case, one of the first officers responding to the scene, Officer DeGruy, testified that the victim was too upset to tell him what had happened and that her brother related the details to him. But the brother, Earl, knew basically what had happened from his first hand knowledge. He testified that he talked with his sister in the presence of police and his mother about what had happened. The mother testified that the victim said Mr. Atkins was messing with her, but it is not clear whether the victim made this statement before police arrived or after.
Therefore, based on Henderson, supra, because the first report of the assault was not *1178 made to Det. Cooper, the trial court erred in allowing Det. Cooper to testify as to what the victim told him when he interviewed her.
Nonetheless, we find the error to be harmless. In Henderson, this court found that it was harmless error for the trial court to admit a hearsay statement that it found was not the initial complaint by the victim. The court set forth the standard for determining whether an error is harmless as follows:
For us to conclude that the admission of the statement constituted harmless error we must be able to conclude, beyond a reasonable doubt, that the improperly admitted hearsay did not contribute to the verdict. Chapman v. State of Cal., 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) rehearing den. Chapman v. California, 386 U.S. 987, 87 S.Ct. 1283, 18 L.Ed.2d 241 (1967); State v. Anderson, 450 So.2d 684 (La.App. 4th Cir.1984) writ denied, 452 So.2d 696 (La.1984).
"Factors to be considered by the reviewing court include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness or material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." State v. Wille, 559 So.2d 1321, 1322 (La.1990).
607 So.2d at 735; see also La.Code Crim. Proc. art. 921.
"Before a reviewing court may declare an error harmless beyond a reasonable doubt it must find that the verdict `actually rendered in this trial was surely unattributable to the error.'" State v. Vale, 96-2953, 97-0158, p. 2 (La.9/19/97), 699 So.2d 876, 877, citing State v. Code 627 So.2d 1373, 1384-85 (La.1993) (quoting Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993)).
The hearsay evidence complained of was a minimal part of the total evidence presented by the State. There was compelling testimony by the victim and her brother as to the actual rape and the events surrounding it, testimony of the doctor who treated the victim immediately after the rape, which testimony corroborated the victim's version of the rape, and physical evidence in the form of pictures of the welts and scratches on the victim's neck. Based on that evidence, and all of the evidence as a whole, even assuming the trial court erred in allowing the hearsay testimony of Det. Cooper, the error was harmless beyond a reasonable doubt, and the verdict rendered in the trial was surely not attributable to the error.

ASSIGNMENT OF ERROR NO. 4:
In this assignment of error Mr. Atkins claims the evidence was insufficient to convict him.
This court recently set forth the applicable standard for reviewing the sufficiency of the evidence to support a conviction in State v. Egana, 97-0318, pp. 5-6 (La.App. 4 Cir. 12/3/97), 703 So.2d 223, 227-8:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosection, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4th Cir. 1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court is not permitted to consider just the evidence most favorable to the prosecution but must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. The fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green; supra. "[A] reviewing court is not called upon to decide whether it believes *1179 the witnesses or whether the conviction is contrary to the weight of the evidence." State v. Smith, 600 So.2d 1319 (La.1992) at 1324.
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
Mr. Atkins was convicted of forcible rape. The essential elements of forcible rape are: (1) an act of vaginal or anal sexual intercourse; (2) without lawful consent of the victim; (3) where the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape. La. Rev.Stat. 14:42.1; State v. Fontan, 624 So.2d 916, 920 (La.App. 4 Cir.), writ denied, 629 So.2d 1181 (La.1993).
The victim's mother testified that she saw Mr. Atkins run downstairs with her son chasing him. Her son told her that Mr. Atkins had been messing with the victim. The son testified that he saw Mr. Atkins engaging in intercourse with the victim while on top of the victim in a bed, with both naked from the waist down, and that Mr. Atkins taunted him, saying he had "fed" his sister. The victim testified that Mr. Atkins grabbed her around the throat, strangled her, threatened to kill her if she did not "give it up to him," and then raped her vaginally while she was on her knees and he was behind her (as opposed to her brother who said Mr. Atkins was on top of her on a bed). She said he did not ejaculate. Dr. Jennifer Miles testified that the physical evidence was consistent with the victim having been strangled or grabbed around the neck and forcibly raped by someone who did not ejaculate. There was no physical evidence to directly tie Mr. Atkins to the crime  none of his seminal fluid, spermatozoa or pubic hair was found in or on the victim's body. The victim's grandfather and a police officer testified that Mr. Atkins made an inculpatory statement indicating he had committed an act for which he was sorry, that he needed to be put in jail and that he needed help. Mr. Atkins also confessed to another police officer to having had intercourse with his stepdaughter and that he was wrong for doing that and needed help.
Viewing all of the record evidence in the light most favorable to the prosecution, and without considering the hearsay testimony by Det. Cooper, any rational trier of fact could have found all of the essential elements of the crime of forcible rape present beyond a reasonable doubt.
There is no merit to this last assignment of error.
Thus, for the reasons set forth above, we affirm the conviction and sentence.
AFFIRMED.
NOTES
[1] Because of the nature of the crime and the victim's age, we will refer to the victim by her initials.
[2] The victim's mother testified that her daughter was sixteen years old. The victim testified she was fifteen years old.
[3] The statute incorrectly reads "purposes." See footnote no. 1, La.Rev.Stat. 15:451.
[4] Appellate counsel's argument is based only on the trial transcript of Det. Cooper's testimony. At the time counsel filed his brief, the transcript of the motion to suppress hearing had not been prepared. We have reviewed both transcripts.