731 So.2d 340 (1999)
STATE of Louisiana
v.
Misty BUFFINGTON.
No. 97-KA-2423.
Court of Appeal of Louisiana, Fourth Circuit.
February 17, 1999.
*342 Harry F. Connick, District Attorney, Susan Erlanger Talbot, Assistant District Attorney, New Orleans, Louisiana, Attorneys for Plaintiff-Appellee State of Louisiana.
Louisiana Appellate Project, Sherry Watters, New Orleans, Louisiana, Attorney for Defendant-Appellant Misty Buffington.
Court composed of Judge ROBERT J. KLEES, Judge WILLIAM H. BYRNES III and Judge CHARLES R. JONES.
KLEES, Chief Judge.
Defendant Misty Buffington was charged by grand jury indictment on May 12, 1994, with first degree murder, a violation of La. R.S. 14:30.[1] Defendant was arraigned on May 18, 1994. On July 18, 1994, the trial court denied defendant's motions to suppress her statement given to St. John the Baptist Parish authorities. On the day of trial, November 17, 1994, the State amended the indictment to charge defendant with second degree murder, a violation of La. R.S. 14:30.1, to which she pleaded not guilty. Following trial by a twelve-person jury, defendant was found guilty as charged. On December 2, 1994, defendant was sentenced to life imprisonment, without benefit of parole, probation, or suspension of sentence. On that same date, the trial court denied defendant's motions for new trial and for post-verdict judgment of acquittal, and defense counsel *343 orally moved for an appeal, informing the court he was withdrawing as counsel. On February 26, 1997, the trial court granted defendant's motion for an out-of-time appeal. The record was lodged with this court on October 29, 1997. Defendant filed her brief on December 23, 1997. On July 17, 1998, the State filed a motion to supplement the record with a copy of the transcript of defendant's statement given to New Orleans police, which motion was granted by this court. The State filed its brief on July 20, 1998.

FACTS
Christina LaPointe testified that she was a friend of defendant and her sister Michelle. She said the two Buffington sisters came to her home on the day after the murder, where the sisters cut and dyed their hair. LaPointe said she knew Robert Juarbe, and had seen him with defendant on more than one occasion. She said Juarbe was a security guard, and that she had seen him in his uniform carrying a gun. On cross examination, LaPointe stated that on the day defendant and Michelle cut and dyed their hair, defendant was crying and upset, and told LaPointe that she was afraid of Juarbe. On redirect examination, LaPointe stated that she had been to parties around Reginald Mason, Daniel Chambers, and Juarbe, and that defendant was present at those parties.
Catherine Strizinger testified that Harrel Clark, the murder victim, was her son, and that he was a cab driver.
Willie Bonney testified that on April 1, 1994, he was employed as a security officer working at the Majik Mart located at the corner of Miro and Canal Streets. Bonney stated that, at approximately 4:15 a.m., he and a fellow security officer, Ray Gisclair, were standing outside talking. He observed a cab pull up directly across the street and park. Another car pulled in behind it and parked, turning off its lights. He saw a white female and a white male get out of the back of the cab, and it looked like they were arguing. Bonney said the male had an object in his hand, which he could not identify. These two individuals got into the parked car. Bonney and Gisclair got into Gisclair's truck, drove over to the cab, and discovered that the driver had been shot. They chased the other car as it drove away. Bonney said he saw two black males in the front of the vehicle. On cross examination, Bonney admitted that he told police that the female he saw was running from the vehicle, hysterical, while the male was in front of her, holding something in his hand.
Todd Bauer testified that, on April 1, 1994, he was working as a news anchor for WWL radio. At 4:15 on that morning, he was driving to work down the center lane of Canal Street, in a riverbound direction. Near the intersection of Tonti and Canal Streets, he saw a young woman step out from the darkness into the right lane, waiving her arms. He noticed a man standing in the darkness approximately six feet behind her, and, finding the situation a little suspicious, drove on. Bauer subsequently reported these events to police.
St. John the Baptist Parish Sheriffs Office Detective Sergeant Paul Schnyder testified that, on April 3, 1994, at approximately 3:00 p.m., he spoke with defendant, her sister, Michelle Buffington, and their father, Michael Buffington, at the parish jail in LaPlace. He subsequently contacted New Orleans Police Department Detectives McCord and Demma, who came to LaPlace that same evening. Det. Schnyder stated on cross-examination that defendant, her sister, and their father appeared voluntarily at the Sheriffs office and that defendant spoke to him voluntarily.
New Orleans Police Officer Frank Oliver, Sr. testified that, on April 1, 1994, at approximately 4:00 a.m., he responded to a call of gunshots being fired in the 2300 block of Canal Street. Upon arriving at the scene with his partner, he observed a United cab, parked with its engine running. The driver was sitting in the driver's *344 seat, with blood running down the side of his head. Officer Oliver notified homicide, and subsequently spoke to Security Officers Bonney and Gisclair. After reviewing his report to refresh his memory, Officer Oliver stated on cross-examination that he took a statement only from Gisclair, and that Gisclair said that he and Bonney were inside the store when they heard a single gunshot. On redirect examination, Officer Oliver stated that his report reflects that Gisclair said that there were two black males in the front passenger seat of the car.
Michael Buffington testified that the defendant was his daughter. Mr. Buffington testified that the prosecutor questioning him at trial had never offered defendant any deal to testify against her co-defendants. He said he turned defendant in to authorities. He said defendant gave a statement to St. John the Baptist Parish authorities in his presence. He also allowed defendant to speak to homicide detectives from New Orleans. He said detectives advised defendant of her rights, but said he had no idea that she was eventually going to be charged with murder. Mr. Buffington stated that he had seen Robert Juarbe at his home twice, and had assumed Juarbe was there to see defendant. On cross-examination, Mr. Buffington stated that defendant and Michelle decided on their own to go to police.
New Officer Police Officer Millard Green, a crime lab technician, testified that on April 1, 1994, he processed a United cab for latent fingerprints. He said he obtained five fingerprints from the cabone from the left rear exterior door, three from the interior of that same door, and another from the right rear door. He said he usually is notified if a match is made with the prints he lifts, but said he had received no such notification regarding those prints.
St. John the Baptist Parish Sheriffs Office Detective Sergeant Andy Breaux testified that on April 3, 1994, he spoke with defendant, her sister, Michelle, and their father, Michael Buffington. Det. Breaux stated that he advised defendant and her father of their Miranda rights prior to questioning them, a procedure he said the sheriffs office adheres to even though the person may not, at that time, be a suspect.
New Orleans Police Officer Carl Palmer, testified that he helped process the scene of the April 1, 1994 early-morning murder. He took photographs introduced into evidence and identified those photographs. He identified a nine millimeter Luger spent casing which he recovered from the rear floor board of cab.
New Orleans Police Detective Marco Demma, with the homicide section, testified that he was called to investigate a homicide which occurred on April 1, 1994, at approximately 4:00 in the morning. Det. Demma recounted how he arrested defendant after he and his partner, Det. McCord, were notified on April 3, 1994, that defendant, her sister, and father had gone to the St. John the Baptist Sheriffs Office. He identified Robert Juarbe, Daniel Chambers, and Reginald Mason, in open court, as three of the four other persons he arrested in connection with the murder, and said he took statements from defendant, Juarbe, Mason, and Chambers. Det. Demma said that, prior to questioning defendant, he advised defendant of her Miranda rights in the presence of her father. Defendant and her father were allowed to speak privately before they waived their rights. Following that meeting, after defendant and her father waived her rights, they were again advised of defendant's Miranda rights on tape prior to her giving a taped statement. The videotape of the statement was played for the jurors, and they were given copies of the transcript of the statement. Det. Demma said articles of defendant's clothing were turned over to police by Mr. Buffington.
On cross-examination, Det. Demma said that defendant waived her rights and gave a statement to police, knowing that she was under arrest. He said defendant gave *345 her the names of Juarbe and Chambers, but did not know Mason's name at that point.
In the statement given to Det. Demma, defendant stated that she and her sister were picked up outside of a movie theater in Laplace around 9:00 p.m. by Robert Juarbe, Daniel Chambers, and another guy, presumably Reginald Mason. They drove to the French Quarter and went to some nightclubs. The three males robbed a car with four other males in it at some point, and the group returned to the French Quarter. The five were headed back to Laplace when Juarbe decided to rob a cab. She and defendant got out of the car and flagged down a cab. The two got into the back seat, defendant first. She said Juarbe then shot the cab driver in the head. They got out of the cab, and started running back to the car. Juarbe told defendant to go back and get the victim's money. Defendant then went back and checked the glove compartment of the cab. She put her hands along the seat, touching the victim and getting blood on her hands, at which point she left the cab and ran back to the car.
It was stipulated that if called as a witness, Dr. William Neuman would testify that he performed an autopsy on the body of Harrell Clark on April 1, 1994, and that Clark was killed by one close gunshot wound to the head.

ERRORS PATENT
A review of the record reveals no errors patent.

ASSIGNMENT OF ERROR NO. 1
By this assignment of error, defendant claims the trial court erred in allowing the State to question defendant's father about plea bargain offers which had been made to defendant.
During the opening statements, defense counsel referred to defendant not taking a "deal." The following colloquy occurred:
BY MR. JENKINS CONTINUED:
* * * * * *
[A]nd now they're trying to make you think that she should go away because, why? She wouldn't take the deal. She said
MR. WOODS:
Wait, wait a minute, Judge. I object to that. Because "she wouldn't take a deal."
MR. JENKINS:
I withdraw the question, Judge.
The State asked that defense counsel be admonished. The trial court then stressed to the jury that what the attorneys say in opening statements is not evidence.
Subsequently, during questioning of defendant's father, the following colloquy occurred:
MR. WOODS:
Q. Can you tell this jury, have I ever, ever offered your daughter any kind of deal to testify against anybody?
MR. JENKINS:
Objection, Judge. I mean, that draws conclusions. If he wants to take the stand
MR. WOODS:
He brought it up, Judge. I don't want it just hanging out there in front of the jury.
MR. JENKINS:
Judge, if he wants to take the witness stand, I'll question him.
MR. WOODS:
He's on the witness stand.
MR. JENKINS:
No. I'm talking about you.
* * * * * *
[court admonishes both attorneys]
THE COURT:
You have an objection?
MR. JENKINS:
Yes.
THE COURT:
What is your objection?
MR. JENKINS:

*346 Judge, I object to any statement about what he did. He can't explain what he might have done. He's the one to determine what he did, Judge.
THE COURT:
I'm going to overrule your objection. Ask the question one more time, please.
BY MR. WOODS CONTINUED:
Q. To your knowledge, have I offered your daughter in your presence or outside of your presence any deal to testify against Robert Juarbe, Reginald Mason, or Daniel Chambers, meaning not Michelle Buffington, Misty Buffington?
A. Not that I'm aware of.
Q. In fact, you were upset with me, right? Because I would not offer her anything, right?
A. No.
The general rule is that evidence regarding any statement made in the course of plea discussions with an attorney for or other representative of the prosecuting authority which does not result in a plea of guilty is not admissible against a party who was a participant in a plea discussion. La. C.E. art. 410(A)(4); see also State v. Lewis, 539 So.2d 1199, 1202-06 (La.1989); State v. Cinel, 95-1723, pp. 4-5 (La.App. 4 Cir. 8/18/95), 660 So.2d 887, 890.
Defendant argues that the trial court erred in allowing the prosecutor to question defendant's father concerning plea bargain offers which had been made to her. However, defense counsel did not object to the admissibility of testimony by defendant's father, or the substance of the prosecutor's questions, on the ground that such were inadmissible as constituting a statement made in the course of plea discussions. Rather, defense counsel simply objected to defendant's father testifying to what the prosecutor did on the ground that the witness was not qualified to explain what the prosecutor did, arguing that the prosecutor himself was "the one to determine what he did."
La.C.Cr.P. art. 841(A) provides that a defendant may not raise an irregularity or error after verdict unless a contemporaneous objection was made thereto at the time of occurrence. La. C.E. art. 103(A)(1) provides that error may not be predicated upon a ruling which admits evidence unless a substantial right of the party is affected, and a timely objection appears of record, stating the "specific ground" of objection. The contemporaneous objection advances the goal of judicial efficiency, in part, by ensuring that a defendant objects to errors which either could have been avoided or corrected at the time, or which should have put an immediate halt to the proceedings. State v. Seals, 95-0305, p. 5 (La.11/25/96), 684 So.2d 368, 373, cert. denied, Seals v. Louisiana, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997).
La.C.Cr.P. art. 841 "requires a defendant to make known the grounds for his objection; and, he is limited on appeal to those grounds articulated at trial...." State v. Chisolm, 95-2028, p. 6 (La.App. 4 Cir. 3/12/97), 691 So.2d 251, 255, writ denied, 97-0938 (La.10/3/97), 701 So.2d 195. In Chisolm, the defendant objected at trial to a ruling prohibiting him from cross-examining a witness about armed robbery charges to impeach the witness's credibility as to his statement that he did not carry weapons. On appeal, the defendant argued that the trial court erred in not allowing him to cross-examine the witness about the armed robbery to impeach his credibility by showing the witness's hopes for leniency. This court held that the defendant was precluded, under La. C.Cr.P. art. 841, from raising this latter claim of error on appeal because he had not objected to the trial court's ruling on the specific ground that the evidence was admissible to impeach the witness's credibility by showing his hopes for leniency. Id.
In the instant case, because defendant failed to object to either the prosecutor's questions or Mr. Buffington's responses on the specific ground that such question or *347 evidence constituted a statement made during plea discussions, defendant failed to preserve the issue for review on appeal.
Moreover, even assuming a proper specific objection had been made to preserve this issue for review, La. C.E. art. 410(A)(4) does not cover this situation. The prosecutor did not attempt to elicit any testimony from defendant's father concerning any statement made during the course of plea discussions. The prosecutor simply asked whether he had offered a deal or plea agreement to defendant to induce her to testify against her co-defendants. Likewise, defendant's father did not testify as to any statement made during plea discussions. He simply stated that he was not aware of the prosecutor offering any such deal or plea agreement to defendant.
The rules prohibiting the admissibility of statements made during the course of plea discussions
serve to promote the negotiated disposition of criminal cases by giving the defendant protection from involuntary self-incrimination at two ends of the plea-bargaining spectrum: while he is negotiating over the disposition of his case and while he is offering or entering a plea that is rejected or is later withdrawn.
State v. Lewis, 539 So.2d 1199, 1202 (La. 1989). Thus, the rule contemplates the accused making incriminating statements during plea discussions, and seeks to prevent the use of such statements against the accused. In the instant case, defendant made no incriminating statements during plea discussions because, based on the record, there were no plea discussions. The testimony by defendant's father was not as to the substance of any statement whatsoever by defendant. The principle behind the rule is not violated in the instant case.
Finally, even assuming La. C.E. art. 410(A)(4) applied, the prosecutor's question and Mr. Buffington's answer would then have been admissible under subparagraph (B)(1), which provides that a statement made during plea discussions is admissible if "another statement made in the course of the same plea or plea discussions has been introduced and the statement ought in fairness be considered contemporaneously with it." La. C.E. art. 410(B)(1). The prosecutor only asked the question in the first place to rebut defense counsel's assertion made during his opening statement that the State was prosecuting defendant because she rejected the State's offer of a deal. Defendant suffered no unjustifiable prejudice as a result of the jury learning that she had not been offered a deal, as claimed by defense counsel.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 2
By this assignment of error, defendant claims the trial court erred in denying her motion to suppress statements made to St. John the Baptist Parish authorities and to New Orleans police.
La. R.S. 15:451 provides:
Before what [purports][2] to be a confession can be introduced in evidence, it must be affirmatively shown that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menace, threats, inducements or promises.
State v. Sepulvado, 93-2692, p. 4 (La.1996), 672 So.2d 158, 163, cert. denied, Sepulvado v. Louisiana, 519 U.S. 934, 117 S.Ct. 310, 136 L.Ed.2d 227 (1996); State v. Hohn, 95-2612, p. 3 (La.App. 4 Cir. 1/19/96), 668 So.2d 454, 456. The State has the burden of proving the admissibility of a purported statement or confession at a motion to suppress hearing. La.C.Cr.P. art. 703(D). State v. Sepulvado, supra; State *348 v. Hohn, supra. "The testimony of police officers alone can be sufficient to prove the defendant's statements were freely and voluntarily given." State v. Gibson, 93-0305, p. 7 (La.App. 4 Cir. 10/13/94), 644 So.2d 1093, 1097. To establish the admissibility of a statement made by an accused person pursuant to custodial interrogation, the State must prove that the accused was advised of his Miranda[3] rights, and that he waived those rights prior to interrogation. State v. Bell, 613 So.2d 744, 746 (La.App. 4 Cir.1993).
In State in the Interest of Dino, 359 So.2d 586, 594 (La.1978), cert. denied, Louisiana v. Dino, 439 U.S. 1047, 99 S.Ct. 722, 58 L.Ed.2d 706 (1978), the Louisiana Supreme Court held that, for the State to meet its burden of demonstrating that a waiver of Miranda rights by a juvenile was made knowingly and intelligently, it must affirmatively show that the juvenile engaged in a meaningful consultation with an attorney or an informed parent, guardian, or other adult interested in his welfare prior to waiving her right to counsel and privilege against self-incrimination. In the recent case of State v. Fernandez, 96-2719 (La.4/14/98), 712 So.2d 485, the Louisiana Supreme Court overruled Dino and reinstated the totality of the circumstances standard applicable to adults which prevailed as to juveniles prior to Dino. 96-2719 at p. 10, 712 So.2d at 490. Under that standard, to determine the voluntariness of a statement, the court must review the totality of the circumstances. State v. Sepulvado, supra.
A trial court's determination as to the admissibility of a statement is within the discretion of the trial court and its decision will not be disturbed unless unsupported by the evidence. State v. Tart, 93-0772, p. 23 (La.2/9/96), 672 So.2d 116, 126, cert. denied, Tart v. Louisiana, 519 U.S. 934, 117 S.Ct. 310, 136 L.Ed.2d 227 (1996); State v. Samuels, 94-1408, p. 7 (La.App. 4 Cir. 6/7/95), 657 So.2d 562, 566. A trial court's conclusions as to the credibility and weight of the testimony relating to the voluntariness of the statement will not be overturned unless they are not supported by the evidence. State v. Brooks, 505 So.2d 714, 721 (La.1987), cert. denied, Brooks v. Louisiana, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987).
Miranda warnings are required to be given whenever a citizen is deprived of his liberty in a significant way or is not free to go as he pleases. State v. Nguyen, 97-0020, p. 3 (La.App. 4 Cir. 1/14/98), 707 So.2d 66, 67, writ not considered, 98-0441 (La.3/27/98), 716 So.2d 879. In Nguyen, this court set out the following factors to aid in determining whether there was a significant detention:
(1) whether the police officer had reasonable cause under C.Cr.P. art. 231(3) to arrest the interrogee without a warrant; (2) the focus of the investigation on the interrogee; (3) the intent of the police officer, determined subjectively; (4) the belief of the interrogee that he was being detained, determined objectively.
97-0020 at p. 3, 707 So.2d at 67, citing State v. Thompson, 399 So.2d 1161, 1165 (La.1981). The Nguyen court further set forth four similar factors to aid in determining the necessity for Miranda warnings:
(1) whether, prior to interrogation, probable cause existed to arrest the accused; (2) statements or actions by the police indicating an intention to hold or restrain him; (3) statements or actions by the accused indicating his reasonable belief that he is in custody and (4) the extent to which the investigation had focused on the accused.
97-0020 at p. 4, 707 So.2d at 67, citing State v. Roach, 322 So.2d 222, 227 (La. 1975).
At the motion to suppress hearing contained in the record, the only law enforcement officer who testified was St. John the *349 Baptist Parish Detective Sergeant Paul Schnyder. The court noted that defendant had not filed a motion to suppress, then denied a motion to suppress for the record as to the statement given by defendant to Det. Schnyder. That statement was not introduced in evidence at trial. However, defendant complains that defendant was arrested based on this statement, before which she had not been advised of her Miranda rights, and that her subsequent statement, given to New Orleans police, was thereby tainted and inadmissible. Therefore, the circumstances surrounding the giving of the first statement must be addressed.

Statement to St. John the Baptist Parish authorities
At the motion to suppress hearing, St. John the Baptist Parish Sheriffs Office Det. Sergeant Paul Schnyder admitted that he did not advise defendant of her Miranda rights prior to her speaking with him. He explained that, while at home, he received a telephone call from the sheriffs office informing him that two white females and a white male had come to the jail area, and that the girls had witnessed a homicide. Upon Det. Schnyder's arrival at the sheriffs office, Mr. Buffington informed him that his daughters had been unable to sleep over the weekend, and said that they had something to tell him about witnessing a homicide. Det. Schnyder said that defendant then proceeded to tell him the whole story. On cross-examination, in response to leading questions by defense counsel, Det. Schnyder confirmed that at the time defendant gave that statement, she was not under arrest, that she had come in of her own accord, and that her father had brought her. Upon questioning by the court, Det. Schnyder stated that he was not aware of any arrest warrant for defendant at the time he spoke with her, and that he thought of her strictly as a witness. He admitted that after defendant made the statement, he still did not advise her of her rights. Defendant's father, Michael Buffington, testified that he did not "really" think that his daughter eventually would be charged with murder. The defendant was not officially placed under arrest until done so by New Orleans Police Det. Marco Demma.
Considering these factors, defendant had not been deprived of her liberty in any way at the time she made her statement to St. John the Baptist Parish Det. Schnyder. Defendant, her sister, and father, voluntarily went to St. John the Baptist authorities not to inform them that defendant had been a party to a homicide, but to inform authorities that the girls had witnessed a homicide. Det. Schnyder said he had no cause to arrest defendant at the time she gave her statement. As far as he was concerned, defendant was a witness to a murder. There was no open investigation by St. John the Baptist Parish authorities of the murder, which had occurred in New Orleans two days earlier. The facts show that defendant did not believe at that time that she was being detained. Therefore, it can only be concluded that defendant was not in custody at the time she began making her statement to Det. Schnyder, and, thus, it was not necessary for him to advise defendant of her Miranda rights. Accordingly, the trial court properly denied the motion to suppress the statement given to St. John the Baptist Parish authorities.

Statement to New Orleans Police
There was no pre-trial ruling on the admissibility of the statement given to New Orleans police. However, if the evidence, such as the recorded statement itself, shows that the statement was given freely and voluntarily in accordance with La. R.S. 15:451, any failure to technically comply with the foundation requirement of the statute is harmless error. State v. Atkins, 97-1278, p. 7 (La.App. 4 Cir. 5/27/98), 713 So.2d 1168, 1173.
New Orleans Police Det. Marco Demma testified at trial, prior to the admission of the statement, that he verbally advised defendant and her father that she *350 was being placed under arrest and would be taken back to New Orleans. He explained the Miranda rights to defendant and her father, and advised them that they could consult with an attorney before waiving those rights. He said that defendant and her father were allowed to privately consult with each other. After meeting privately, defendant and her father agreed that defendant would waive her rights and make a statement. Det. Demma stated that, at that point, he began taping, and again advised defendant and her father of her Miranda rights, as reflected by the following excerpt from the taped statement:
Q: Okay. Uh, Misty, prior to this interview, interview being conducted, uh, isn't it uh, a fact that you ... along with your father and your sister Michelle, turned yourself in to the authorities at St. John's Sheriffs Office earlier this afternoon.
A: Yes sir.
Q: Okay. And this is in regards to the shooting incident involving the cab driver in New Orleans, is that correct?
A: Yes sir.
Q: Alright. And prior to being given this statement uh, in the presence of your father and, and again I wanna address this to you, Mr. Buffington ... uh,... as to your daughter's rights. Uh, do you understand, you need not make any statements. Do you understand that, sir?
A: Yes sir.
Q: Do you understand that anything said may be used against your daughter in a court of law? Do you understand that?
A: Yes.
Q: Do you understand that your uh, daughter has a right to have an attorney present before answering any questions?
A: Yes I do.
Q: Do you also understand that if she cannot afford an attorney, the courts will obtain an attorney to represent and advise her?
A: Yes I do.
Q: Okay. Uh ..., and she has, she has a right to have an attorney present before answering any questions, whether it be her own attorney or a court-appointed attorney. Do you understand that?
A: Yes.
Q: Alright. Uh ... being her parent and guardian and understanding those rights, was it your wish to allow your daughter to waive her rights and render this statement?
A: Yes.
Q: Okay. Also, prior to giving this statement, were you allowed to ... confide with your daughter alone prior to giving this statement?
A: Confide ... what do you mean?
Q: In other words, were you and your daughter allowed to talk alone before we gave ... before the giving of this statement?
A: Yes. Yes.
Q: And it's your wish at this point to go ahead with this statement?
A: Yes.
Q: Okay. And ... were you made aware of ... although this statement was being given, that there's no promises being made in lieu of this statement?
A: Yes.
Q: And that there was no threats or, or coercion made ... uh, to force this statement being made?
A: Correct.
The testimony of Det. Demma and the transcript of the tape recorded statement establish that, under both the Dino and totality of the circumstances standards, defendant and her father were properly advised of defendant's Miranda rights and that such rights were validly waived. The evidence also shows that the statement was free and voluntary, and not made under the influence of fear, duress, intimidation, *351 menace, threats, inducements or promises. Accordingly, it cannot be said that the trial court erred in admitting into evidence defendant's statement to Det. Demma.
Defendant argues that the statement to St. John the Baptist Parish authorities was obtained illegally because defendant was not advised of her rights prior to making it, and, therefore, her arrest by Det. Demma, based on that statement, was illegal. Defendant submits that, as her arrest was illegal, her post-arrest statement to Det. Demma was fatally tainted, regardless of whether she and her father properly waived her rights before making it.
As previously stated, the evidence shows that the first statement was not given as a result of a custodial interrogation. Therefore, there was no need to advise defendant of her Miranda rights at the time she gave the statement to St. John the Baptist Parish authorities. Accordingly, the statement was lawfully taken, and the arrest was legal. However, even assuming the first statement was unlawfully taken, and the subsequent arrest illegal, for the following reasons, the second statement given to New Orleans Police Det. Demma was not fatally tainted.
For a confession taken following an illegal arrest to be admissible, the State must demonstrate that the connection between the illegal arrest and the confession is so attenuated that the confession could not properly be considered the fruit of the illegal arrest. See Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). A statement given during a period of illegal detention is inadmissible, even though voluntarily given, if it is the product of the illegal detention and not the result of an independent act of free will. State v. Fisher, 97-1133, p. 11 (La.9/9/98), 720 So.2d 1179, 1998 WL 568738. Factors to be considered in making this determination are whether the defendant was advised of her Miranda rights prior to making the statement, the temporal proximity of the arrest and confession, the existence of intervening circumstances, and the purpose and flagrancy of any official misconduct. Brown v. Illinois, 422 U.S. 590, 603-04, 95 S.Ct. 2254, 2261-62, 45 L.Ed.2d 416 (1975); State v. Serrato, 424 So.2d 214, 217 (La. 1982). The relevant question is whether the police "came at" the confession by exploitation of the primary illegality (the illegal arrest), or whether the statement was "sufficiently an act of free will to purge the primary taint." Brown v. Illinois, 422 U.S. at 599-602, 95 S.Ct. at 2259-2261, 45 L.Ed.2d 416, quoting Wong Sun, supra.
In the instant case, defendant's statement to Det. Demma was made almost immediately following his placing her under arrest. However, defendant and her father obviously came to law enforcement authorities prepared to tell the full story of the murder. As the evidence shows, Det. Demma fully advised both defendant and her father of her Miranda rights, and those rights were knowingly and intelligently waived. Clearly, defendant's statement to Det. Demma was the result of her free will, and not the result of the exploitation of an illegal arrest by Det. Demma, again, even assuming for the sake of argument that the arrest was illegal. Any taint as a result of an illegal arrest in this case was, beyond any doubt, purged by the freely and voluntarily given statement by defendant.
In conclusion, the trial court properly denied the motion to suppress the statement given by defendant to St. John the Baptist Parish authorities. Even assuming the trial court should have suppressed that statement because defendant had not been advised of her Miranda rights, the court properly admitted into evidence the subsequent statement given by defendant to New Orleans Police Det. Demma.
There is no merit to this assignment of error.

*352 ASSIGNMENT OF ERROR NO. 3

By this assignment of error, defendant claims that the trial court erred in failing to excise a portion of defendant's statement to Det. Demma, wherein she stated that during the hours preceding the murder, her co-defendants committed an unrelated armed robbery.
In the course of her statement to Det. Demma, defendant made two references to a robbery committed by her co-defendants:
So we headed out to the [French] Quarters [sic]. And we went out there and we went to a coupla clubs and everything, you know. And we're walkin' around and everything ... and then they decided to rob this guy and ... in his car. They have these four guys in this car that they robbed. And they jus'... they got like, fifteen dollars out of `em, or somethin'. Somethin' around there and we went back out to the Quarters [sic] for little while. And then ... after that ... we were on our way home.
Det. Demma later asked defendant about that robbery:
QQ [sic]: When, when they robbed that other car before the shootin', how did they do it? They pulled up in their car and got out, or did they go around, park around the corner and walked up to it... or ... ?
A: No. They, they pulled up by the car and got out.
La. C.E. art. 404(B)(1) provides:
B. Other crimes, wrongs, or acts. (1) except as provided in Article 412, evidence of other crimes, wrongs, or acts, is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
In State v. Nicholson, 96-2110 (La.App. 4 Cir. 11/26/97), 703 So.2d 173, writ denied, 98-0014 (La.5/1/98), ___ So.2d ___, 1998 WL 234690, this court stated:
In general, evidence of other crimes is inadmissible in the guilt phase of a criminal trial. Admission of evidence that the defendant may have committed other crimes creates the risk the defendant will be convicted simply because he is a "bad person" and juror confusion may occur when collateral issues are presented. Additionally, a defendant may not be prepared to confront such evidence. State v. Code, 627 So.2d 1373 (La.1993), cert. denied, Code v. Louisiana, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 491 (1994).
Nicholson, 96-2110 at p. 9, 703 So.2d at 178. Generally, the State is required to give a defendant notice that evidence of other crimes will be offered and which exception the State is relying upon. Code, supra, at. 627 So.2d 1373, 1381. See also State v. Matthews, 94-2112, p. 7 (La.App. 4 Cir. 4/26/95), 654 So.2d 868.[4] The record contains no such notice given by the State in the instant case. However, the prohibition against other crimes evidence pertains to other crimes by the defendant, not other crimes of someone else. State v. Bordenave, 93-1682, p. 18 (La.App. 4 Cir. 8/23/95), 660 So.2d 1207, 1217, reversed on other grounds, 95-2328 (La.4/26/96), 678 So.2d 19.
In the instant case, the trial court declined to excise the statements complained of on the ground that they did not constitute a reference to any other crime committed by defendant. The statements *353 by defendant do not refer to another crime committed by her. Rather, she refers to a robbery "they" did, meaning her co-defendants. Defendant argues, however, that she was a principal to that crime, just as she was alleged to have been a principal to the murder committed later that night, for which she was convicted as a principal. Defense counsel also argued at trial that, at the very least, defendant was an accessory after the fact to the robbery. While defendant may have been considered an accessory after the fact to the robbery, considering the written jury charges contained in the record, the jury was not instructed as to the law of accessory after the fact.[5] As to defendant being a principal to the robbery, based on the law of principals as set out in the jury charges contained in the record, defendant's statement does not implicate her as a principal. Therefore, as far as the jury knew, defendant was not a principal to the robbery, and thus, the jury was not informed of any other crimes by defendant. The trial court did not err in admitting the complete statement given by defendant.
Moreover, considering the overwhelming evidence of defendant's guilt, as a result of her confession, and considering that she simply stated that her co-defendants committed an unrelated robbery in which she did not take part, any error by the trial court in admitting the complete statement was harmless beyond a reasonable doubt. The verdict in the instant case was surely unattributable to any such error. State v. Vale, 96-2953, 97-0158, p. 2 (La.9/19/97), 699 So.2d 876, 877.
There is no merit to this assignment of error.

CONCLUSION
For the foregoing reasons, defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] Also charged in the same indictment were co-defendants Robert Juarbe, Daniel Chambers, and Reginald Mason. The trials were severed on July 18, 1994. This appeal concerns only Misty Buffington.
[2] The statute reads "purposes," but it should be "purports." See footnote no. 1, La. R.S. 15:451.
[3] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[4] This is required by State v. Prieur, 277 So.2d 126 (La.1973), which has not been overruled by the enactment of La. C.E. art. 404. See State v. Code, supra.
[5] The record does not contain a transcript of the trial court's jury instructions.