JAMES F. McKAY III, Chief Judge.
1 faltón B. Lewis appeals his conviction and sentence. Based on the record before this Court, we affirm his convictions and sentences. Finding a patent error, we remand the matter to impose a fine in accordance with La. R.S. 14:32.1(B).
STATEMENT OF CASE
On June 22, 2012, the State charged the defendant, Dalton B. Lewis, with two counts; count one (1), the vehicular homicide of Claire Lajaunie, a violation of La. R.S. 14:32.1, and count two (2), the first degree vehicular negligent injuring of Joy Bonin, a violation of La. R.S. 14:39.2. On May 1, 2013, the defendant appeared for trial and a jury was selected. On May 2, 2013, a unanimous jury found the defendant guilty of both counts. On August 22, 2013, after denying the defendant’s motions for new trial and post-verdict judgment of acquittal, the defendant waived all sentencing delays. After hearing four victim impact statements, the trial court sentenced the defendant to twenty (20) years for count one and five (5) years for count two, to be served concurrently. Five (5) years of the count one sentence were to be served without benefit of probation, parole, or suspension of sentence. The trial court denied the defendant’s oral motion to reconsider the sentences. This appeal follows.
^STATEMENT OF FACT
On Saturday, February 11, 2011, at approximately 7:00 p.m., the defendant, Dalton Lewis (“defendant”), and his friend, Matthew Pelegrini (“Pelegrini”), attended a Mardi Gras parade in Slidell. After the parade, the two men stopped by an acquaintance’s house before deciding to drive to New Orleans at around 10:00 p.m. On the way, the defendant stopped at a gas station and purchased a bottle of alcohol, Jagermeister. At around 10:15 p.m., the defendant, while driving his black Lexus (“Lexus”), struck the rear of a silver Honda Pilot (“SUV”) driven by Ms. Joy Bonin. Ms. Bonin’s vehicle careened into the guardrail, eventually flipping over causing severe injuries to her and killing her passenger, Ms. Claire Lajaunie. Earlier that evening, Ms. Bonin and Ms. Lajaunie had been in Bay St. Lewis, Mississippi attending a family birthday party.
Ms. Bonin was transported to University Hospital. The defendant and his passenger were transported to Touro Infirmary for treatment for their injuries. Ms. La-jaunie’s body remained in the SUV. No field sobriety test was conducted at the scene of the accident. At approximately *1254 1:00 a.m., nearly three hours after the accident, after being released from the hospital, the defendant was transported to the New Orleans Police Department DWI Headquarters, where the investigating detective administered the defendant a horizontal gaze nystagmus (“HGN”) test and a chemical breath test. The results showed that the defendant had blood alcohol content (“BAC”) of .161, over twice the legal limit to operate a motor vehicle.
The following facts and evidence were deduced from the record.
On the night of February 11, 2012, Officers Raymond Smith and Demond Davis of the New Orleans Police Department (“NOPD”) were on patrol in the 1 .-¡Seventh District of New Orleans. Officer Smith was driving and Officer Davis was sitting in the front passenger seat. They were in the process of transporting a prisoner to Central Lockup. As they entered 1-10 at Read Boulevard, headed west, they saw a black car traveling at extreme miles per hour and swerving between lanes. Officer Davis radioed the command desk to report the incident. Pursuant to department policy, they did not chase the speeding vehicle because they had a prisoner.
Seconds later, Officers Smith and Daws came upon the accident involving the Lexus and the SUV. Officer Smith, after securing the scene, began searching for victims. He observed a limb hanging out of the rear window of the SUV. Moments later, more Seventh District officers and Emergency Medical Services arrived at the scene.
On cross-examination, Officer Smith testified that the Lexus was small and looked similar to a Honda when initially seen speeding down I — 10. Between initially seeing the speeding car and the accident, the officers lost visual contact with the speeding vehicle.
Officer Davis testified that he estimated that the black, four door vehicle was driving over 100 miles per hour (“m.p.h.”), explaining, “the best way I can describe it is, it looked like all other vehicles was [sic] at a standstill where the vehicle was moving, going from lane to lane.”
Officer Davis identified his voice on the dispatch recording from that night. The recording was played for the jury. The first vehicle observed, the SUV, was overturned and laying on its roof top. When he approached the SUV, he observed two people, one who “was awake but she was kind of out of it” and the other person who was not responding. He called in the non-responding woman as dead.
UOfficer Davis observed the occupants of the Lexus sitting on the guardrail at the scene of the accident. Officer Davis identified the defendant as one of them. When he approached the occupants, Officer Davis observed that both were “shaken up real bad” and “then also I could smell a strong odor of alcohol, and alcoholic beverage emanating from them, both of them.” Officer Davis then advised both men of their Miranda rights. Officer Davis explained that as the defendant was in police custody at that point, he accompanied the defendant to the hospital. While at the hospital, Officer Davis stated that once the defendant was separated from his passenger, he continued to smell alcohol coming from the defendant.
On cross-examination, Officer Davis testified that the defendant did not slur his speech when he initially approached him at the scene of the accident. Officer Davis did not perform a field sobriety test at the accident scene. He was never directed to request a blood test.
NOPD Detective Edgar Edwards, who is assigned to the fatality investigations for the Traffic Division, led the investigation of this case. On the night of February 11, 2012, Detective Edwards went to the scene of the accident. Detectives Anthony Pon *1255 tiff and Richard Blackman, also of the fatality division, were also ordered to the scene. At the scene, photographs were taken. Some sixty-six photographs were introduced as evidence. Detective Edwards observed damage to the rear of the overturned SUV. The deceased, Claire La-jaunie, was still inside. Her left foot was sticking out of a rear passenger window of the SUV. The Lexus, which was facing traffic, had severe front end damage, and both airbags had deployed. After talking to the defendant about what he had consumed |fion the night of the accident, Detective Edwards returned to the vehicle and found a bottle of Jagermeister in the back seat.
Initially, when Detective Edwards spoke to the defendant at the hospital, he was in stable condition, sitting upright on a stretcher and was coherent and lucid. Later, after entering the defendant’s room, Detective Edwards opined that he smelled a strong odor of alcohol; he immediately advised the defendant of his Miranda rights. The defendant told Detective Edwards that he had been to a parade in Slidell and was driving to New Orleans to attend a party when he struck a vehicle from behind as he drove on a curve in the road. The defendant admitted to having consumed a shot of Southern Comfort, a daiquiri, and Jagermeister. After the conversation, Detective Edwards instructed Officer Davis to take the defendant to the DWI office.
At approximately 1:00 a.m., the defendant left the hospital wearing a sling on his arm and was transported to the DWI office. At the DWI office, Detective Edwards performed a “horizontal gaze nys-tagmus[,]” commonly referred to as “the eye test” on the defendant. Detective Edwards explained that horizontal gaze nys-tagmus is the involuntary jerking of the eyes, and the test is performed by having someone follow an object — like a pen. The result of the test was “six clues” from the performance of three tests on two eyes. This result indicated impairment.
The defendant then agreed to take a breathalyzer test. The defendant’s blood alcohol content was .161. The legal limit is .08. Detective Edwards testified that one has to be certified every two years to use the Intoxilyzer 5000, commonly known as the “breathalyzer.” He was certified when he gave the test to the defendant.
| ^Detective Edwards testified that the breathalyzer was administrated twice, at 12:59 a.m. and 1:00 a.m. Upon seeing the .161 blood alcohol content result, Detective Edwards advised the defendant that he was over the legal limit and that he was under arrest. The defendant responded by starting to cry and saying that “he had to take responsibility for what he had done.” Detective Edwards completed his paper work, and the defendant was transported to Central Lockup.
On cross-examination, Detective Edwards testified that the crash occurred at approximately 10:15 p.m., and the breathalyzer was administered at 1 a.m. He did not perform a full field sobriety test — no walk and turn tests or one legged stand tests were performed. Detective Edwards opined that he would have noted any unsteadiness of gate and slurring of speech in his report if the defendant had exhibited such. No such symptoms were recorded in the report. Detective Edwards affirmed that he chose the breathalyzer over a blood test, even though a blood test is more accurate.
On re-cross-examination, Detective Edwards reasoned that he did not perform a walking and turning test or a one legged stand test because the defendant would have been imbalanced due to the arm sling, making such tests unreliable.
Officer Dennis Recasner checks brake systems when there has been a fatal acci *1256 dent. When he went to the crash site, he detected no abnormalities in the SUV’s brake system, likewise with the Lexus.
Dr. Richard Tracy is a part-time forensic pathologist with the coroner’s office. He performed the autopsy of Claire Lajau-nie. He concluded that the cause of death was blunt force injuries-a scalp laceration that caused an air embolism. He explained that Ms. Lajaunie lost virtually all of her blood. As this happened, blood in the heart was replaced with air. This is an air embolism. This process |7took no more than five or ten minutes. He opined that the accident caused Ms. Lajaunie’s death.
On cross-examination, Dr. Tracy was asked about alcohol absorption. He testified that the time it takes for alcohol to be absorbed into the blood is extremely variable and is impacted by the presence of food in the stomach-most importantly, fatty food. He testified that it was conceivable that alcohol could be ingested as quickly as within fifteen minutes by an empty stomach. At the other end, he opined that three hours would be within the range of time it might take for alcohol to be absorbed by a person who had drunk wine with a big meal.
The defendant’s medical records were introduced through Melanie Hidalgo, the operations manager at the Medical Record Department at Touro Infirmary.
Officer Joseph Pollard, of the New Orleans Police Department’s Criminal Records, is a latent fingerprint examiner. He took a sample of the defendant’s fingerprints and compared them to the fingerprints of the defendant in St. Tammany Parish case No. 2008-KS-01060. The documentation from that record included a waiver of rights form and a guilty plea form, wherein the defendant pled guilty to operating a vehicle while intoxicated on March 5,2008. The fingerprints from case No. 2008-KS-0160 matched the fingerprints of the defendant taken on the day of trial.
The 911 recording for the incident, No. B016649-12, was introduced through Lyndrell Varise, a 911 operator for the New Orleans Police Department. A recording of a dispatch from police officers that observed a speeding car on the night of the incident was also introduced. The defendant objected under |sCrawford,.[1] The objection was denied, and the 911 recording was played for the jury.
Matthew Pelegrini testified that on February 11, 2012, he was a passenger in the defendant’s vehicle at the time of the accident. They had been friends for approximately ten years. On the day of the accident, at approximately 5:00 or 6:00 p.m., before going to a parade in Slidell, they had met at the defendant’s house in Pearl River. The parade started at 7:00 p.m. Pelegrini admitted that he had consumed “a daiquiri and a couple of beers” at the parade. He said that the defendant had consumed “[p]retty much the same.” Pe-legrini was not sure, but estimated that the parade ended at “[mjaybe nine o’clock.” After the parade, they purchased a bottle of liquor at a store before proceeding to a friend of a friend’s house, where Pelegrini recalled that the defendant drank, but did not remember what he drank. Pelegrini and the defendant left the house twenty or thirty minutes later after an altercation occurred when Pelegri-ni knocked a bottle of Jagermeister off a counter and it broke on the floor. They then began to drive to New Orleans to meet some friend at a bar. Pelegrini recalled that the defendant was driving fast and “going in and out” during the drive.
Pelegrini remembered the noise of the collision but did not remember getting out *1257 of the vehicle. As a result of the accident, Pelegrini sustained cuts and bruises. He and the defendant remained friends but did not speak much between the time of the accident and trial. However, when refreshed with a copy of his deposition at trial, Pelegrini recalled that he had spoken to the defendant and that the defendant admitted to being drunk at the time of the accident.
|flOn cross-examination, Pelegrini testified that he had felt pressure from the district attorney’s office to say that the defendant had been driving over 100 m.p.h. He said they were going close to 100 m.p.h. through a wooded area East of Jaz-zland, but they “weren’t going as fast” when they reached the Morrison curve, and he did not recall the speed at the time of the accident. Pelegrini did not recall the defendant stumbling or slurring his speech at the accident scene. During the ambulance ride to the hospital, the defendant knew where they were, where they were going, and that an accident had occurred.
Immediately before the accident, Pele-grini observed that the defendant had both hands on the steering wheel. They were passing the other vehicle on the left. Both vehicles were in their respective lanes.
The State later recalled Pelegrini to the witness stand where he read from a written statement that he wrote on the night of the accident. It stated that as the defendant and he drove from Slidell to New Orleans, right before the high rise, they were driving “pretty fast” and “ran into the back of a vehicle.” On cross-examination, he testified that he did not see the crash take place and did not remember it at all. He was pretty intoxicated when he wrote the statement.
Ms. Joy Bonin was driving the SUV at the time of the accident. Ms. Lajaunie was her passenger. They had known each other since grammar school and were like sisters. On February 11, 2012, they went to a birthday dinner for Ms. Bonin’s son-in-law in Bay St. Louis. Ms. Bonin drank iced tea at dinner. They left dinner at around 9:00 or 9:30 p.m. to drive home.
Ms. Bonin described Ms. Lajaunie as “a very active person who was always ready to go.” She had many friends, liked to travel, went to the movies, and played 110cards. The two ladies went on cruises together. Before the accident, Ms. Bonin was very active. The accident was “a big setback.”
On the night of the accident, Ms. Bonin said that she was driving in the middle lane, as was her custom. She described the accident as follows:
Out of nowhere it just seemed like a big explosion. And the steering wheel just literally flew out of my hands and it seemed like everything was moving. And then after that, I think I lost consciousness until the car, I guess, stopped and I thought we were right side up and I learned later that we were turned over so it was on the roof.
Ms. Bonin recalled the impact was in the rear of her vehicle. She recalled an ambulance and bright lights before passing out. The next thing she remembered was being cold in the ambulance-they were cutting her clothes off. She did not find out about Ms. Lajaunie until several days later.
As a result of the accident, Ms. Bonin sustained a broken pelvis, a fractured neck, a hematoma of the brain, and other injuries. She was hospitalized for three months. The neck injury did not heal and a bone fusion with a bone graft was performed on Ms. Bonin on February 20, 2013. Her neck was still healing at the time of trial. She is no longer able to drive, which has resulted in a big change in her quality of life.
On cross-examination, Ms. Bonin testified that she did not see the other vehicle *1258 prior to the accident. She was driving between sixty-five and seventy m.p.h. She denied changing lanes at the time of the accident.
The defense recalled Joy Bonin to the stand and asked her about a civil lawsuit she had filed, wherein the defendant, American Motor Company, Inc., and the city of New Orleans were named as defendants, for injuries sustained in the February 11, 2012 accident.
InThe defendant took the stand in his own defense and testified that at approximately 5:00 p.m. on February 11, 2012, he was at his parents’ house, where he ate steak and a baked potato. He denied having anything to drink at that time. He met Pelegrini at his house at approximately 6:30 p.m. They got in his car and went to a daiquiri shop where they each purchased a large daiquiri and proceeded to the parade. He finished his daiquiri at approximately 8:30 p.m. He admitted taking a shot of Southern Comfort during the time he drank the daiquiri.
After the parade, Pelegrini and the defendant went to a house, where they stayed only fifteen minutes because Pele-grini knocked a bottle of alcohol off a counter top causing a mess. He denied drinking anything there. He had “a couple of slices of pizza” at the parade. The defendant opined that Pelegrini drank more than he did.
After leaving the house, they decided to meet some friends at a bar off Decatur Street. They stopped at a gas station on Old Spanish Trail, where they bought a bottle of Jágermeister. They mixed “a little bit of Red Bull and a little bit of Jágermeister” and “drank a little bit on the ride.”
It took approximately fifteen or twenty minutes to drive from the gas station to the Morrison curve, where the accident occurred. He admitted to driving at approximately seventy-five m.p.h. over the “bridge” or twin span and speeding up more in New Orleans East. By the time he reached the Little Wood exit, he had slowed down. During the drive, Pelegrini fell in and out of sleep. The defendant asserted that he was paying attention to his driving.
The defendant entered the Morrison curve in the left lane. He was going approximately seventy to seventy-five m.p.h. Ms. Bonin was driving in the middle lane. The defendant estimated she was traveling fifteen or twenty m.p.h. per hour | ^slower than he was. The impact occurred at the end of the curve, where the interstate straightens out. The defendant denied moving out of his lane prior to impact. When asked if Ms. Bonin drifted into his lane, the defendant testified, “[i]t seemed to appear that way; yes, sir.” The defendant’s car was impacted on the front passenger side. His car began spinning. The SUV went “the other way and it was spinning and then it was behind” the defendant’s car. When the defendant’s car stopped, it was facing the SUV. The defendant denied running “straight into the back of her.” [Ms. Bonin] The defendant and Pelegrini got out of their car, walked around a minute, and then saw that the SUV was in the back of them, overturned. Officer Davis arrived at the scene “pretty fast.” While the defendant and Pelegrini were sitting on the concrete guardrail, another officer approached and handcuffed them together. No one asked the defendant if he had been drinking at the accident scene, and he did not think he was intoxicated at the time. He did not believe he had run into Ms. Bonin’s vehicle. He hypothesized that he was driving in her blind spot, and that she veered into his lane and overcompensated going the other way after impact. He proclaimed feeling terrible about the accident and sorry for the loss involved, but did not believe he was at fault.
*1259 Detective Edwards spoke with the defendant briefly at the hospital before another officer took him to the station. No one talked to the defendant about how much he drank that night or suggested that he was intoxicated at the hospital. He recalled expressing sorrow on hearing about the accident while at the hospital, but did not say he took responsibility for it. He did not agree with testimony that he had been driving 100 m.p.h. at the time of the accident. He also denied being drunk or over the legal limit at the time of the accident, but said it seemed like he was more intoxicated by the time the breathalyzer was administered. He admitted 11sto drinking “a little bit” of alcohol some five minutes before the accident. On cross-examination, he admitted to weaving in traffic, but denied going at a high rate of speed.
ERRORS PATENT
The record reveals one error patent, an illegally lenient sentence. La. R.S. 14:32.1(B) mandates a fine of between $2,000 and $15,000. The trial court failed to impose a fine in this case. The sentence appears legal in all other respects. Accordingly, the matter is remanded to impose a fine in accordance with La. R.S. 14:32.1(B).
DISCUSSION
ASSIGNMENTS OF ERROR NUMBERS 1 & 2
In his first two assignments of error, Lewis asserts the record is insufficient to support his convictions based upon: 1) the evidence showing intoxication was unreliable and insufficient, and 2) the record fails to show his intoxication caused the February 11, 2012 accident.
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Captville, 448 So.2d 676 (La.1984); State v. Ennis, 2011-976, pp. 4-5 (La.App. 4 Cir. 7/5/12), 97 So.3d 575, 579. However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court is not permitted to luconsider just the evidence most favorable to the prosecution but must consider the record as a whole, since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall, 523 So.2d at 1309-1310; State v. Strother, 2009-2357, p. 10 (La.10/22/10), 49 So.3d 372, 378. “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319, 1324 (La.1992).
A factfinder’s credibility decision should not be disturbed unless it is clearly contrary to the evidence. State v. Huckabay, 2000-1082, p. 33 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093, 1111; State v. Harris, 99-3147 (La.App. 4 Cir. 5/31/00), 765 So.2d 432.

Intoxication

Lewis was charged with violating La. R.S. 14:32.1[2] and La. R.S. 14:39.2[3]. Both *1260 crimes involve driving when “under the influence of alcoholic beverages,” 11F,see La. R.S. 14:32.1(A)(1 & 4) and La. R.S. 14:39.2(A)(1), or “[t]he offender’s blood alcohol concentration [being] .08 percent or more by weight based upon grams of alcohol per one hundred cubic centimeters of blood.” See La. R.S. 14:32.1(A)(2) and La. R.S. 14:39.2(A)(2).
hfiThe defendant argues that the evidence used to show he was intoxicated is both insufficient and unreliable[4]. The accident occurred at approximately 10:15 p.m. on February 11, 2012. The defendant admitted that he started drinking between *1261 7:00 p.m. and 8:45 p.m. at a parade, and that he consumed a daiquiri and a shot of Southern Comfort. After the parade, the defendant went to a party for some fifteen minutes before driving to New Orleans. He admitted to drinking Jágermeister with Red Bull during the drive to New Orleans some five minutes before the collision occurred. Although, the defendant testified that he ate a steak and a stuffed potato before the parade, and several slices of pizza at the parade, the consumption of a daiquiri, a shot of Southern Comfort, and Jágermeister and Red Bull just five minutes before the accident, support the jury’s conclusion that the defendant was under the influence of alcohol at the time of the accident under La. R.S. 14:32.1(A)(1 & 4) and La. R.S. 14:39.2(A)(1). The jury’s conclusion is consistent with Dr. Tracy’s testimony that alcohol can be absorbed into the blood in as little as fifteen minutes on an empty stomach, and may take up to the range of three hours on a stomach full of fatty foods. The jury’s conclusion is also supported by Detective Edwards’ testimony that results from the “horizontal gaze nystagmus,” or eye test, included “six clues” that indicated impairment.
Detective Edwards’ testimony supports the proposition that the defendant violated La. R.S. 14:32.1(A)(2) and La. R.S. 14:39.2(A)(2); both of those clauses prohibit a person from causing the death or injury of a person when the following condition exists: “[t]he offender’s blood alcohol concentration is 0.08 percent or more by weight based upon grams of alcohol per one hundred cubic centimeters of 117blood.”[5] Emphasis added. When Detective Edwards administered the breathalyzer test, the defendant blew 0.161, just over twice the legal limit. The record contains ample evidence to support the jury’s finding that the defendant was under the influence of alcohol at the time of the accident or at approximately 10:15 p.m. of February 11, 2012.

Causation

In order to prove a person has committed vehicular homicide, the State must prove beyond a reasonable doubt that a causal connection between the defendant’s unlawful blood alcohol concentration and the victim’s death. State v. Taylor, 463 So.2d 1274 (La.1985). Generally, unless the legislature expressly stipulates otherwise, conduct prohibited by a criminal statute must produce criminal consequences, the proscribed conduct must be causally related to a proscribed criminal consequence. Id. at 1275, citing La. R.S 14:7-9 (crime defined and criminal conduct and consequences). La. R.S. 14:39.2 also requires a causation showing between the defendant’s intoxication and the victim’s injuries. Causation is a question of fact to be considered in light of the totality of circumstances surrounding the ultimate harm and its relation to the prohibited conduct. State v. Kalathakis, 563 So.2d 228, 231 (La.1990).
The evidence in this case supports the jury’s conclusion that the defendant caused Ms. Lajaunie’s death and Ms. Bo-nin’s injuries. Detective Edwards’ testimony about the crime scene revealed that the defendant’s Lexus had front end damage and the victims’ silver Honda Pilot had rear end damage. Pictures of the | ^damages to both vehicles were shown to the jury. Officer Recasner checked the brakes of both vehicles and found them to be in working order. Pelegrini opined that the defendant was driving at approximately 100 miles per hour through New Orleans East, but recalled that they had slowed down by the time they reached the *1262 Morrison curve, where the accident occurred. The defendant admitted to speeding up from seventy-five miles per hour through New Orleans East, but estimated he was driving only seventy to seventy-five miles per hour by the time he reached the Morrison curve. This estimation is contradicted by the testimony of Officers Smith and Davis, who observed the defendant’s car as they entered 1-10 at Read Boulevard. Both officers observed a car going so fast that the cars around them appeared to be at a standstill. From this observation, Officer Davis estimated the defendant’s speed to be over 100 miles per hour. Officer Smith described the speed as “extreme miles per hour.” Officer Davis testified that the defendant was swerving or weaving between lanes. This evidence is sufficient to support the jury’s conclusion that the defendant caused the accident. Any evidence to the contrary, presented to the jury, goes to weight, not sufficiency. Moreover, Detective Edwards’ testimony that the defendant failed the eye test shows a physical impairment, at the very least, contributed to causing the accident that caused the victims’ injuries. Therefore, we conclude that the record supports the jury’s finding that the defendant was under the influence of alcohol and that this impairment caused the accident. The defendant’s first two assignments of error have no merit.
I ASSIGNMENT OF ERROR NUMBER 3
The defendant asserts that the trial court erred in admitting 1) evidence of his prior conviction for driving while intoxicated in 2008, and 2) the 911 tapes from this accident at trial.

Other crimes evidence

A certified pack from St. Tammany Parish in case No. 2008-KS-01060 was entered into the record. That documentation showed that the defendant pled guilty to operating a vehicle while intoxicated on March 5, 2008. Defense counsel made no objection.
In State v. Brooks, 98-0693, p. 9 (La.App. 4 Cir. 7/21/99), 758 So.2d 814, 819 this Court stated:
A defendant cannot avail himself of an alleged error unless he made a contemporaneous objection at the time of the error. La.C.Cr.P. art. 841(A); State v. Seals, 95-0305, p. 5 (La.11/25/96), 684 So.2d 368, 373, cert. denied, Seals v. Louisiana, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997). Not only does an objection have to be made, but La.C.Cr.P. art. 841(A) “requires a defendant to make known the grounds for his objection; and he is limited on appeal to those ground articulated at trial....” State v. Buffington, 97-2423, p. 9 (La.App. 4 Cir. 2/17/99), 731 So.2d 340, quoting State v. Chisolm, 95-2028, p. 6 (La.App. 4 Cir. 3/12/97), 691 So.2d 251, 255, writ denied, 97-0938 (La.10/3/97), 701 So.2d 195.
As no objection was made to the introduction of the prior conviction at trial, this argument has not been preserved for appeal.

911 tape

The confrontation clause of the Sixth Amendment to the U.S. Constitution bars “admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.” Crawford v. Washington, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 1365, 158 L.Ed.2d 177 (2004). In Davis v. Washington, 547 U.S. 813, 822, 126 S.Ct. 2266, 2273, 165 L.Ed.2d 224 (2006), the U.S. Supreme Court declared that “[statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the *1263 interrogation is to enable police assistance to meet an ongoing emergency.” Conversely, statements are “testimonial when the circumstances objectively indicate there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecutions.” Id., 547 U.S at 822, 126 S.Ct. at 2273-4. In Davis, the Court used this test to find that statements made to a 911 operator were non-testimonial because they constituted a call for help during an ongoing threat by a caller, and the questions asked were for information necessary to resolve the present emergency. The defendant complains that the recordings were of 911 calls from people describing the accident. Under these circumstances, where the 911 calls were describing a present emergency, we find no error in the trial court’s ruling denying the defendant’s motion to exclude them.
ASSIGNMENT OF ERROR NUMBER 4
The defendant asserts that his twenty year sentence for vehicular homicide and five year sentence for first degree vehicular injuring are excessive. Louisiana Constitution of 1974, art. I, § 20 provides, in pertinent part, that “[n]o law shall subject any person to ... excessive ... punishment.” A sentence is unconstitutionally excessive when it imposes punishment grossly disproportionate to the severity of the offense or constitutes nothing more than needless infliction of pain and suffering. State v. Bonanno, 384 So.2d 355, 357 (La.1980). A trial judge has broad discretion when imposing a sentence, and a reviewing court may not set a sentence aside absent a manifest abuse of discretion. State v. Smith, 2001-2574, p. 6 (La.1/14/03) 839 So.2d 1, 4. On appellate review of a sentence, the relevant question is not whether another sentence might have been more appropriate, but whether the trial court abused its broad sentencing discretion. State v. Walker, 00-3200, p. 2 (La.10/12/01), 799 So.2d 461, 462. In performing such a review, the appellate court “must consider the punishment and crime in light of the harm to society caused by its commission and determine whether the penalty is so disproportionate to the crime committed as to shock our sense of justice.” Bonanno, 384 So.2d at 358; State v. Williams, 2013-0271, p. 3 (La.App. 4 Cir. 11/13/13), 129 So.3d 692, 694-95.
La. R.S. 14:32.1(B) provides the following sentencing mandates and ranges for vehicular homicide:
Whoever commits the crime of vehicular homicide shall be fined not less than two thousand dollars nor more than fifteen thousand dollars and shall be imprisoned with or without hard labor for not less than five years nor more than thirty years. At least three years of the sentence of imprisonment shall be imposed without benefit of probation, parole, or suspension of sentence. If the operator’s blood alcohol concentration is 0.15 percent or more by weight based upon grams of alcohol per one hundred cubic centimeters of blood, then at least five years of the sentence of imprisonment shall be imposed without benefit of probation, parole, or suspension of sentence. If the offender was previously convicted of a violation of R.S. 11:98 [(operating a vehicle while intoxicated) ], then at least five years of the sentence of imprisonment shall be imposed without benefit of probation, parole, or suspension of sentence. The court shall require the offender to participate in a court-approved substance abuse program and may require the offender to participate in a court-approved driver improvement program. All driver improvement courses required under *1264 this Section shall include instruction on railroad grade crossing safety.

Emphasis added.

La. R.S. 14:39.2(D) provides for a fine of up to two thousand dollars, a sentence of up to five years, or both.
l-aHere, the trial judge iterated her reasons for sentencing under La. C.Cr.P. art. 894.1; noted the prior conviction for driving while intoxicated — which, under the circumstances, she found especially troubling; noted a failure to appear in court; and noted mitigating circumstances. Finally, the trial court iterated its opinion that, given a death, and Ms. Bonin’s injuries, any lesser sentence would deprecate the seriousness of the offenses.
In State v. LeBlanc, 2009-1355 (La.7/6/10), 41 So.3d 1168, the Court found the maximum thirty year sentence was not excessive for a first offender mother of two convicted of vehicular homicide. The Court noted Leblanc was an addict who was high on eight drugs at the time of the accident, and that her guilty plea did not necessarily acknowledge her guilt. Comparatively, the trial court here imposed only a twenty year sentence. Under the circumstances of this case, the defendant fails to show the trial court abused its discretion.
In State v. Cozzetto, 2007-2031 (La.2/15/08), 974 So.2d 665, the Court upheld a maximum five year sentence for first degree negligent injury where the defendant’s blood alcohol content was .23 over the legal limit, and the injury had provided obvious disfigurement. Here, the defendant had a blood alcohol content slightly over twice the legal limit. Ms. Bonin testified at trial that she suffered a broken pelvis, a fractured neck, hematoma of the brain, and other injuries in the accident. She had to be hospitalized for three months. She is no longer able to drive, resulting in a big change in her quality of life. At sentencing, her son, Brett, testified that the defendant had only minimal insurance, and that Ms. Bonin had had to sell her house “to deal with all this.” Given this evidence, the trial court did not abuse its discretion in issuing the maximum sentence.
^CONCLUSION
We affirm the defendant’s conviction on both counts one (1), and two (2), and the sentence for count two (2) is affirmed. The sentence for count one (1) is illegally lenient in that the trial court failed to impose a fine. Accordingly, we remand this matter in order to impose a fine in accordance with La. R.S. 14:32.1(B).
AFFIRMED IN PART AND REMANDED.
BONIN, J., concurs with reasons.

. Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

. La. R.S. 14:32.1 provides, in pertinent part:
A. Vehicular homicide is the killing of a *1260 human being caused proximately or caused directly by an offender engaged in the operation of, or in actual physical control of, any motor vehicle, aircraft, watercraft, or other means of conveyance, whether or not the offender had the intent to cause death or great bodily harm, whenever any of the following conditions exists and such condition was a contributing factor to the killing:
(1) The operator is under the influence of alcoholic beverages as determined by chemical tests administered under the provisions of R.S. 32:662.
(2) The operator’s blood alcohol concentration is 0.08 percent or more by weight based upon grams of alcohol per one hundred cubic centimeters of blood
[[Image here]]
(4) The operator is under the influence of alcoholic beverages.
[[Image here]]
B.Whoever commits the crime of vehicular homicide shall be fined not less than two thousand dollars nor more than fifteen thousand dollars and shall be imprisoned with or without hard labor for not less than five years nor more than thirty years. At least three years of the sentence of imprisonment shall be imposed without benefit of probation, parole, or suspension of sentence. If the operator’s blood alcohol concentration is 0.15 percent or more by weight based upon grams of alcohol per one hundred cubic centimeters of blood, then at least five years of the sentence of imprisonment shall be imposed without benefit of probation, parole, or suspension of sentence. If the offender was previously convicted of a violation of R.S. 14:98, then at least five years of the sentence of imprisonment shall be imposed without benefit of probation, parole, or suspension of sentence. The court shall require the offender to participate in a court-approved substance abuse program and may require the offender to participate in a court-approved driver improvement program. All driver improvement courses required under this Section shall include instruction on railroad grade crossing safety.

. La. R.S. 14:39.2 provides in pertinent part:
A. First degree vehicular negligent injuring is the inflicting of serious bodily injury upon the person of a human being when caused proximately or caused directly by an offender engaged in the operation of, or in actual physical control of, any motor vehicle, aircraft, watercraft, or other means of conveyance whenever any of the following conditions exists:
(1) The offender is under the influence of alcoholic beverages.
(2) The offender's blood alcohol concentration is 0.08 percent or more by weight based upon grams of alcohol per one hundred cubic centimeters of blood
[[Image here]]
B. The violation of a statute or ordinance shall be considered only as presumptive evidence of negligence as set forth in Subsection A.
C. For purposes of this Section, "serious bodily injury” means bodily injury which involves unconsciousness, extreme physical pain or protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member or organ or a mental faculty, or a substantial risk of death.
D. Whoever commits the crime of first degree vehicular negligent injuring shall be fined not more than two thousand dollars or imprisoned with or without hard labor for not more than five years, or both.

. The defendant’s claim that the tests were unreliable goes to the admissibility of the breathalyzer results. The record contains no objection to the admission of the breathalyzer test results. Accordingly, the reliability argument has not been preserved for review by this Court.

. La. R.S. 14:32.1(A)(2) refers to the “operator's " blood alcohol, rather than the "offender's.” Emphasis added. This does not differentiate the substance of the two clauses.